STATE OF NEBRASKA, APPELLEE, V. STEVEN JACOB, APPELLANT.

574 N.W. 2d 117

Filed February 13, 1998.   No. S-95-885.

952

Dennis R. Keefe, Lancaster County Public Defender, and Sean J. Brennan for appellant.

Steven Jacob, pro se.

Don Stenberg, Attorney General, and J. Kirk Brown for appellee.

WHITE, C.J., CAPORALE, WRIGHT, CONNOLLY, GERRARD, STEPHAN, and MCCORMACK, JJ.

WRIGHT, J.
## NATURE OF THE CASE
Following a retrial, Steven Jacob was found guilty of first degree murder in the death of Melody Hopper and second degree murder in the death of James Etherton. He was also found guilty of using a firearm to commit those crimes. Jacob was sentenced to two terms of life imprisonment and two terms of not less than 6 years 8 months nor more than 20 years' imprisonment, all sentences to be served consecutively. Jacob timely filed this appeal.

## SCOPE OF REVIEW
A motion for change of venue is addressed to the discretion of the trial judge, whose ruling will not be disturbed absent an abuse thereof. *State v. McHenry*, 247 Neb. 167, 525 N.W.2d 620 (1995).

The decision whether to grant a motion for mistrial is within the discretion of the trial court and will be upheld on appeal absent a showing of abuse of discretion. *State v. Anderson*, 252 Neb. 675, 564 N.W.2d 581 (1997).

In a criminal case, a motion for new trial is addressed to the discretion of the trial court, and unless an abuse of discretion is shown, the trial court's determination will not be disturbed. *State v. Kula*, 252 Neb. 471, 562 N.W.2d 717 (1997).

An appellate court reviews a motion for new trial on the basis of prosecutorial misconduct for an abuse of discretion by the trial court. *State v. Thompson*, 246 Neb. 752, 523 N.W.2d 246 (1994).

## FACTS

Jacob and Hopper began dating in February 1988, but the relationship had deteriorated by June or early July 1989. Hopper began dating Etherton and eventually moved into Etherton's residence in July 1989.

On August 1, 1989, Hopper went to see her supervisor at her place of employment. She appeared flushed, very fidgety, and visibly upset. Raymond Gifford, Hopper's supervisor, testified that he knew Hopper fairly well and that he had never seen Hopper as agitated and angry as she was on that occasion.

Gifford testified that Hopper told him that shortly after Etherton left the house that morning, Hopper heard the door handle rattle and the doorbell ring. When she opened the door, Jacob entered uninvited and stated that he wanted to talk to Hopper about getting back together. Hopper told Jacob she was no longer interested in getting back together. Jacob told Hopper that he at least wanted to talk to her and that if she would not do that, he might do something drastic. Hopper had difficulty getting Jacob to leave and had to physically shove him out of the house. She then locked all the doors and windows, and called Etherton at his place of employment to tell him what had happened.

On August 2, 1989, at approximately 3:45 a.m., John Ingram, a coworker of Etherton's who rented a basement bedroom from Etherton, awoke to use the bathroom. Dressed in underwear and a cutoff T-shirt, Ingram started toward the bathroom. As he walked out of the bedroom, he saw glass sparkling on the floor by the back door. Ingram heard the floor above him creak and, realizing someone was in the house, went back to the nightstand in his bedroom and retrieved a .22-caliber pistol. He returned to the basement stairway, where he heard three quick gunshots. He heard a woman scream twice and three or four more shots. After the last shot, he heard a shell casing roll around somewhere upstairs and a thump on the floor directly above him.

Believing that someone had been shot, Ingram decided to get out of the house. He ran out the back door, went around the corner of the house, jumped the fence, and ran down the block. He ran north to the corner and then west three houses. Ingram went to a house he believed was a fire marshal's, rang the doorbell,

and knocked on the door. When the door was answered, Ingram stated that someone had been shot and that "they emptied a clip on them."

Det. Sgt. Larry Barksdale joined Sgt. Larry Nelson at the Etherton house at approximately 4 a.m. They discovered that the back, basement screen door had been propped open with a rock and that the glass on the inner door was broken out. Barksdale observed a storm window lying on the ground which had apparently been removed from the window immediately south of the basement door and was later found to contain fingerprints matching Jacob's.

After entering the house and making their way upstairs, the officers discovered Etherton's nude body lying at the end of the hallway, near the northeast bedroom door. He had suffered multiple wounds from three gunshots. The officers then heard a faint voice cry for help from the bedroom, where they found Hopper, nude and bleeding, under the bed. Suffering several wounds apparently caused by two gunshots, Hopper died several days later. Investigators found six shell casings and one live round in the northeast bedroom and the hallway. Sgt. Mark Bohaty testified that all the casings were from fired 9-mm bullets and that all were fired from the same weapon. The live round was also a 9-mm cartridge.

Jacob's father testified that Jacob had owned a 9-mm pistol, which Jacob's father had last seen in the summer of 1989, or perhaps earlier. Jacob testified that he had owned a 9-mm Llama pistol. Bohaty testified that the rifling characteristics of the shell casings from the scene were consistent with those produced by a 9-mm Llama pistol. The pistol itself was apparently not recovered.

Found in the bedroom was a typed four-page letter written by Jacob to Etherton dated July 9, 1989. At trial, Jacob testified that the letter was written to explain a comment made by him to Etherton about holding Etherton responsible for Hopper. The letter stated that Jacob did not mean for the comment to be interpreted as a threat. After describing Hopper's past history of relationship problems, the letter explained, "I would like you to be successful where I failed her." The letter further stated:

> It's almost unbelievable to think that I spent both Tuesday and Thursday nights with Melody and then on

Sunday she is sleeping with you and on Wednesday you're off to Wyoming without a single word to me; not even a "Dear John" letter.

If I hadn't known that this has happened before I am not sure what I would think about Melody.

Jacob ended the letter by stating that he doubted that Etherton or Hopper would ever speak to him again, but hoped that Etherton would "be happy and more successful than I have been."

Officer Todd Beam arrived at the neighbor's house where Ingram was and then accompanied Ingram downtown for questioning. In testifying about his observations of Ingram on the morning of the interrogation, Beam stated that he had detected a very slight odor of stale alcohol, but he did not believe Ingram was intoxicated or impaired by alcohol. Although Beam did not recall Ingram's telling him anything about any person Ingram saw or the make and model of a car, Beam recalled that while they were still at the neighbor's house, Ingram mentioned something about a car he had seen drive by. Beam described Ingram's demeanor at the neighbor's house as excited and agitated, but stated that Ingram had calmed down considerably by the time he started taking Ingram's taped statement at 6:19 a.m. During this statement, Ingram did not mention seeing a car.

At trial, Ingram testified that as he waited outside for the police to be called, he saw a car drive by. The car was light-colored and was going slow. Ingram said he saw the driver for a few seconds and made eye contact. He described the driver as having a receding hairline, glasses, a mustache, and dark hair. Ingram testified that the evening after he was questioned, he saw a picture of Jacob on the news and recognized Jacob as the person he had seen drive by shortly after the shooting. Ingram called the police, and when they came to talk to him the next morning, he identified Jacob. During his testimony, Ingram identified Jacob as the driver of the vehicle.

At trial, Jacob stated that he left on vacation shortly after speaking with Hopper on August 1, 1989. He drove to Minnesota; Sioux Falls, South Dakota; Grand Forks, North Dakota; Winnipeg, Ontario, Canada; and Montreal, Quebec, Canada. He then drove to Boston, Massachusetts, and back up

to Canada. On August 9, Jacob bought a ticket from St. John, New Brunswick, Canada, to London, England. Jacob testified that he decided not to fly out of St. John, however, because he found the parking at the St. John airport to be inadequate and he believed he could exchange his ticket for a better fare flying out of Boston. Jacob said that on his way to Boston, he was delayed by an accident on the highway, and he decided to fly to Boston from nearby Bangor, Maine. He wanted to sell his van there because of mechanical difficulties he had experienced throughout the trip. Before attempting to sell the van in Bangor, Jacob bought a ticket from Bangor to Boston and checked in his luggage at the Bangor airport. Jacob was arrested on August 10 in Brewer, Maine, when he attempted to sell his van to a used-car dealership.

Jake Faulkerson shared a cellblock with Jacob for a brief period in September 1989. Faulkerson testified that while in prison, Jacob had stated that he "was not going to end up doing a minute on his time . . . because he didn't leave any witnesses." Jacob then allegedly told Faulkerson, " 'I shot him first so the bitch could see what she had coming.' "

Following his convictions and sentences, Jacob appealed.

## ASSIGNMENTS OF ERROR

Jacob makes the following assignments of error: (1) The trial court erred in overruling his motions to change venue and in failing to change venue to another county, thereby denying his due process right to a fair trial by an impartial jury; (2) the trial court erred in failing to grant Jacob's motions to strike certain venirepersons for cause, including those who knew of inadmissible evidence, thereby requiring Jacob to use peremptory challenges, all in violation of Jacob's due process right to a fair trial by an impartial jury; (3) the trial court erred in overruling Jacob's motion to prohibit jury dispersal and to require sequestration during trial, and in failing to sequester the jury during trial, in violation of his due process right to a fair trial by an impartial jury; (4) the trial court erred in failing to hold an adequate hearing and in overruling Jacob's motion for mistrial, motion for special prosecutor, and motion for new trial relating to the juror misconduct resulting from the discovery of a news-

paper article in the jury room, thereby denying Jacob his due process right to a fair trial; (5) the trial court erred in failing to inform Jacob about a communication from the jury, in having unauthorized contact with the jury during deliberations, and in overruling the motion for new trial on those grounds, thereby denying Jacob his due process right to a fair trial; (6) the trial court erred in failing to admit exhibit 644, Ingram's taped statement; in instructing the jury in the absence of and without the knowledge of Jacob; and in misinstructing the jury regarding exhibit 644; (7) the trial court erred in testifying as a witness at the trial and enhancing the credibility of Ingram, thereby prejudicing Jacob and denying him his right to a fair trial; (8) the trial court erred in overruling defense objections and in admitting the testimony of Gifford regarding a conversation that he had with Hopper, because that evidence was hearsay and did not qualify as an excited utterance; (9) the trial court erred in sustaining the State's objection to, and failing to admit as evidence, the testimony of witnesses Sue Jacob and Patricia Ockinga regarding conversations they had with Hopper, thereby denying Jacob his due process right to present evidence; (10) the trial court erred in overruling Jacob's motion for a mistrial and motion for new trial based upon prosecutorial misconduct in the closing arguments, thereby allowing the State to comment upon and violate Jacob's rights to remain silent, to face-to-face confrontation, to the effective assistance of counsel, and to be personally present during his trial; (11) the trial court erred in overruling Jacob's motion to strike witness Faulkerson and in allowing him to testify at trial, because these actions denied him his right to confrontation and his right to due process, and because the probative value of the testimony of Faulkerson was substantially outweighed by the danger of unfair prejudice and misleading the jury; (12) the trial court erred in sustaining the State's objection to exhibit 673, the videotape interview of Samual "Buddy" Phifer, and in refusing to admit the same into evidence, thereby denying Jacob his due process right to present evidence; (13) the trial court erred in finding that the State had met its burden to establish the admissibility of evidence that Jacob's departure from Lincoln, Nebraska, and the circumstances surrounding his arrest in Brewer, Maine, constituted

evidence of flight; in admitting such evidence at trial; and in determining that the probative value of such evidence was not substantially outweighed by the prejudicial effect; (14) the trial court erred in failing to give Jacob's proposed jury instruction on flight; (15) the trial court erred in overruling Jacob's motion to dismiss at the close of all of the evidence, in overruling the motion for a new trial based upon insufficiency of the evidence, and in finding sufficient evidence to support the convictions; and (16) the trial court erred in failing to find that Jacob was denied his due process right to a fair trial by the cumulative effect of all the preceding assigned errors.

Additionally, in his pro se supplemental brief, Jacob assigns as error that (17) the trial court erred in denying the motion to dismiss on double jeopardy grounds, (18) the trial court erred in not granting Jacob a hearing on his claims of ineffective assistance of counsel, (19) trial counsel was ineffective, (20) the trial court erred in not allowing evidence of Etherton's jealous violence toward women, (21) the trial court erred in allowing Ingram's identification testimony into evidence, (22) the trial court erred in not allowing Jacob access to expert witnesses, (23) the trial court erred in not removing the Lancaster County Attorney from this case and in not allowing the county attorney to be called as a witness at the motion to dismiss, (24) the trial court erred in sustaining an objection to exhibit 642, and (25) applying the new circumstantial evidence standard in this case would violate the prohibition against ex post facto laws.

## ANALYSIS

### CHANGE OF VENUE

Jacob argues that the trial court abused its discretion in failing to grant his motion for a change of venue. In essence, Jacob claims that the numerous newspaper articles and radio and television broadcasts made it impossible for him to receive a fair trial.

To warrant a change of venue due to pretrial publicity, mere exposure to news accounts of a crime does not presumptively deprive a criminal defendant of due process. Rather, to warrant a change of venue, a defendant must show the existence of pervasive misleading pretrial publicity. *State v. McHenry*, 247 Neb.

167, 525 N.W.2d 620 (1995). A motion for change of venue is addressed to the discretion of the trial judge, whose ruling will not be disturbed absent an abuse thereof. *Id.* A trial court abuses its discretion in denying a motion to change venue where a defendant establishes that local conditions and pretrial publicity make it impossible to secure a fair trial. *State v. McBride*, 250 Neb. 636, 550 N.W.2d 659 (1996).

A number of factors must be evaluated in determining whether the defendant has met the burden of showing that pretrial publicity has made it impossible to secure a fair trial and impartial jury. Among them are the nature of the publicity, the degree to which the publicity has circulated throughout the community, the degree to which the publicity circulated in areas to which venue could be changed, the length of time between the dissemination of the publicity complained of and the date of trial, the care exercised and ease encountered in the selection of the jury, the number of challenges exercised during voir dire, the severity of the offenses charged, and the size of the area from which the venire was drawn. *Id.*; *State v. McHenry, supra.*

Much of the pretrial publicity reflected the fact that this was a retrial and dealt with Hopper's identification of Jacob, which we held in *State v. Jacob*, 242 Neb. 176, 494 N.W.2d 109 (1993), to be inadmissible. Jacob admits that the news accounts were "accurate as far as they went," but claims they were misleading in that they failed to recite the reasons why Hopper's statements were not admitted. See brief for appellant at 17. He claims the media coverage included negative characterizations of him by the prosecutor and the judge, the most significant of which was that the Lancaster County Attorney had stated through the media that he had faith in Hopper's dying declaration and that the State's case was in shambles without it. The trial court overruled the motion for change of venue, stating that it would be reconsidered when and if a jury was selected.

We have previously explained that voir dire examination provides the best opportunity to determine whether venue should be changed. *State v. McBride, supra*; *State v. Bowen*, 244 Neb. 204, 505 N.W.2d 682 (1993). In addition to general voir dire, the trial court ordered individual, sequestered questioning of the jury so that an independent and extensive voir dire could be

conducted with respect to each prospective juror. All prospective jurors were questioned separately, and some underwent additional followup questions.

The fact that there were many newspaper articles and television broadcasts is only one of the factors to be considered. In *McHenry, supra,* we held that the law does not require a juror to be totally ignorant of the facts and issues involved, and it is sufficient if the juror can lay aside his or her impressions or opinions and render a verdict based upon the evidence presented in court. Based on our review of the record, we cannot say that the trial court abused its discretion in denying the change of venue.

### MOTIONS TO STRIKE

Related to the issue of venue is Jacob's claim that the trial court erred in failing to sustain his motions to strike certain venirepersons for cause, including those who knew of inadmissible evidence, thereby requiring Jacob to use peremptory challenges. During voir dire, the defense moved to strike 31 of the 64 venirepersons for cause. The court sustained 11 of those motions. Of the remaining 20 jurors Jacob moved to strike, all but 3 venirepersons were removed through peremptory challenges by both sides. Of those three, two were removed prior to deliberations. Jacob points out that because he had used his peremptory challenges, one juror to which the defense had previously objected, Gerald Nelson, remained on the jury panel. He claims he was thus prejudiced by the trial court's denial of his motion to strike.

During voir dire, Nelson stated that he was aware of the murders and Hopper's identification of Jacob from 1989 newspaper accounts, although he stated:

> I guess I kind of feel like what you read in the paper isn't always necessarily the truth. I didn't read in depth about what really went on and I don't know what really went on.
>
> . . . .
>
> [T]o me it's like what kind of shape was [Hopper] in when she nodded and I — did she — I don't know if she understood the question fully or what. I mean, I'm just not — I know you're asking me how can I put that out of my mind, but I think that if — I think I would go more on

what goes on here. That's all I can tell you. Here people are sworn under oath.

The competency of a juror is generally presumed, and the burden is on the challenging party to establish otherwise. *State v. Rice*, 231 Neb. 202, 435 N.W.2d 889 (1989). The question of whether a prospective juror should be removed for cause is addressed to the discretion of the trial court and is subject to reversal only when clearly wrong. *State v. Benzel*, 220 Neb. 466, 370 N.W.2d 501 (1985).

We conclude that the trial court did not abuse its discretion by denying Jacob's motion to strike venireperson Nelson.

Regardless of whether Jacob was prejudiced by the ultimate makeup of the jury, Jacob claims he had a right not to have to use peremptory challenges to cure what Jacob contends were the trial court's numerous errors. In *Ross v. Oklahoma*, 487 U.S. 81, 89, 108 S. Ct. 2273, 101 L. Ed. 2d 80 (1988), the Court explained that because peremptory challenges are a creature of statute and are not required by the Constitution, a " 'right' " to peremptory challenges is " 'denied or impaired' " only if the defendant does not receive that which state law provides. The Court stated that since the applicable state law required that peremptory challenges had to be exercised to rectify the trial court's errors in denying motions to strike, the petitioner received all that he was due. In *State v. Bradley*, 236 Neb. 371, 461 N.W.2d 524 (1990), we stated that *Ross* makes it clear that the federal Constitution's requirement of due process is met as long as a state's statutorily mandated number of peremptory challenges is granted. The effect of *Ross* is to leave to each state the question of whether a wrongful denial of a challenge for cause violates due process because a peremptory challenge must be used to eliminate that venireperson. *State v. Bradley, supra.*

Of the remaining 20 venirepersons who were subject to Jacob's motions to strike for cause, Jacob exercised 11 peremptory challenges. Two other jurors were removed before deliberations as the result of an investigation of jury tampering—Jeff Eske and Alvin Meier—and the only remaining venireperson who was subject to a defense motion to strike for cause who actually served on the jury was Nelson.

Jacob complains that Susan Jones, who was removed with one of his peremptory challenges, should have been struck for cause because she worked for the Department of Correctional Services at the penitentiary. Jones worked in the mailroom opening mail, and there is no evidence that she had any direct contact with the inmates or custodial responsibilities. Jacob has not cited any authority which would indicate that Jones had to be stricken because she worked in a prison. Neb. Rev. Stat. § 25-1601(1) (Reissue 1995) provides: "Persons disqualified to serve as either grand or petit jurors are . . . (d) jailers . . . ." The trial court refused to disqualify Jones on this basis, and we conclude that the trial court did not abuse its discretion.

Jacob argues that the trial court erred in failing to allow him to strike for cause certain jurors who indicated that they had previously heard something about his case. Jacob relies upon Neb. Rev. Stat. § 29-2006 (Reissue 1995), which provides that there is good cause for striking a prospective juror when "(2) . . . he has formed or expressed an opinion as to the guilt or innocence of the accused . . . ." Of the remaining venirepersons subject to Jacob's motions to strike for cause, all stated that they were willing and had the ability to afford Jacob a presumption of innocence and would set aside any previous impressions of the case and render a verdict based solely upon the evidence presented at trial.

We find that the trial court did not abuse its discretion in denying these challenges for cause.

JURY SEQUESTRATION

Jacob argues that the trial court erred in overruling his motion to prohibit jury dispersal and to require sequestration during trial. Whether a jury is to be kept together before submission of the cause in a criminal trial is left to the discretion of the trial court. *State v. Bradley, supra.* To warrant reversal, denial of a motion to sequester the jury before submission must be shown to have prejudiced the defendant. *Id.*

Jacob claims that during the trial, the jurors were exposed to publicity which was highly prejudicial. On September 30, 1994, a September 8 edition of the Lincoln Star was found in the jury room. The newspaper was on the corner of the jury table, lying

open to the page containing an article entitled "Prosecution in Jacob case won't use dying declaration." As will be discussed further below, those jurors who were found to possibly have knowledge of the newspaper's contents and who were found to have anything to do with the newspaper's being in the room were excused before deliberation.

Therefore, Jacob has failed to show that he was prejudiced by the trial court's denial of his motion to sequester, and this assignment of error is without merit.

## JUROR MISCONDUCT

Jacob asserts that the trial court erred in failing to hold an adequate hearing and in overruling his motion for mistrial, motion for special prosecutor, and motion for new trial relating to juror misconduct. According to Jacob, the exposure of certain jurors to the above-mentioned newspaper article, as well as later discussion among the jurors as to who might have been responsible, constituted prejudicial jury misconduct.

The trial court conducted an immediate inquiry into the scope of the jury's exposure to the newspaper. The bailiff testified that she entered the jury room at approximately 12:30 p.m. and that the only person in the room was alternate juror Meier. There was no newspaper on the table at that time. Thereafter, at approximately 1 p.m., juror Eske brought the newspaper to the bailiff, stating that it was found in the jury room. After giving the newspaper to the judge, the bailiff went to the jury room and asked the jurors who had been in the room during the lunch break and whether anyone had seen a newspaper. The bailiff did not give the jurors any further information about the newspaper, and she told them that they should not discuss the matter among themselves. The court questioned all those jurors who were thought to have been in the jury room at any time between the bailiff's visit and the discovery of the newspaper.

When Eske was questioned, he stated that he returned to the jury room from lunch at approximately 12:55 p.m. Alternate juror Meier and juror Lois LaPage were the only persons in the room at that time. Eske saw a newspaper lying on the table, but did not stop to look at it. Eske stated that after he sat down, juror Charlene Bady entered the room. She noticed the newspa-

per and realized that it contained an article about the case. Bady announced that the newspaper should not be there, and because Bady's hands were full, Eske took it to the bailiff. Eske explained that in the course of so doing, he noticed that the headline made reference to the prosecution not using a " 'dying statement.' "

When LaPage was questioned, she stated that she had never seen a newspaper in the room. After Eske arrived, LaPage went to get a soft drink. When she returned, the bailiff entered and asked about whether a newspaper had been lying on the table. At that time, Bady explained that a newspaper with an article about the case had been found in the room. LaPage stated she told Bady she did not want to hear anything about the article. Other than the fact that it made reference to the case, Bady did not reveal what the article was about, and LaPage stated that she could set aside the incident in deciding the case.

Finally, Meier and Bady were questioned. Meier stated that he had gone out to smoke a cigarette and that he knew nothing about the newspaper until the bailiff came in and questioned the jury about it. He stated that he could set aside anything relating to the incident. Bady stated that when she entered the jury room, Meier and Eske were the only persons present. She immediately saw the newspaper, and upon reading "Prosecution" and "Jacob case," she announced that it should not be there. Bady explained that she did not know anything else about the article and that she could disregard anything involving the incident in making her decision in the case.

Based on this initial inquiry, Jacob moved for a mistrial, which motion was overruled. Jacob then moved to strike Eske because, based upon the evidence that was adduced, he was the only one that could recall what the headline said. The trial court granted the motion and selected Meier by lot as the person to replace Eske. Jacob then moved to strike Meier because, by process of elimination, it appeared that Meier and Eske were the only jurors who could have brought the newspaper into the room. The court overruled the motion to strike, as well as Jacob's renewal of his motion for mistrial.

Further investigation into the incident was conducted by the Lincoln Police Department and the Lancaster County Sheriff's

Department. During a break in closing arguments, Det. Sgt. Robert Marker, Jr., reported that he had concluded that the only juror who could have placed the newspaper in the jury room was Meier. Jacob again moved for a mistrial, which motion was also overruled, but the trial court removed Meier from the jury and replaced him with another alternate.

After the verdict was rendered, Jacob moved for a new trial on the grounds, inter alia, that interviews of some of the jurors after the verdict showed there might have been speculation that defense counsel placed the newspaper in the jury room. Jacob's counsel made particular reference to Bady, who, upon being questioned after the verdict as to who might have placed the newspaper in the jury room, stated that she thought it was defense counsel.

At the hearing on the motion for new trial, Jacob adduced testimony from all members of the jury panel, including excused and alternate jurors. Several of the jurors indicated that they knew there was an incident involving a newspaper, and some jurors were further aware that a newspaper was found in the jury room which contained an article involving the trial. However, other than Eske, who had been excused before deliberations, none of the jurors knew anything else about the article.

Neither did there appear to have been extensive discussion or speculation prior to the verdict as to who might have placed the newspaper there. Two jurors, John Noonan and Eske, mentioned that they might have heard a comment from an unknown juror that defense counsel could have brought the newspaper in. However, all of the jurors denied forming any opinion or making any statement with regard to defense counsel's possibly being responsible for the newspaper. Besides Noonan and Eske, none of the other jurors remembered hearing any such comment. Bady, in particular, testified that at no point prior to the verdict did she form or express an opinion as to who might have brought in the newspaper.

The trial court, after reviewing all the evidence, found beyond a reasonable doubt that Jacob was not prejudiced by the presence of the newspaper article or by any speculation as to who might have placed the newspaper in the jury room and overruled the motion for new trial. The court noted that Jacob

made no attempt prior to deliberations to question any of the remaining jurors.

Where jury misconduct in a criminal case involves juror behavior only, the burden to establish prejudice rests on the party claiming the misconduct. *State v. McDonald*, 230 Neb. 85, 430 N.W.2d 282 (1988). In a criminal case, a motion for new trial is addressed to the discretion of the trial court, and unless an abuse of discretion is shown, the trial court's determination will not be disturbed. *State v. Kula*, 252 Neb. 471, 562 N.W.2d 717 (1997). Jacob has failed to establish that he was prejudiced, and we find this assignment of error to be without merit.

### EX PARTE INSTRUCTION

Jacob claims that the trial court erred in its ex parte instruction to the jury and in overruling a motion for new trial on those grounds. During deliberation, the jury sent the following message to the court: "We are unable to find the tape in evidence of the testimony of Mr. Ingram with Officer Beam." The court's ex parte response was that "[a] portion of the tape was played in court but not received in evidence."

The State had called Ingram as a witness to relate the events occurring the night of the murders. Ingram testified about the light-colored car's slowly going west on Lexington Avenue and his later identification of Jacob as the driver.

Ingram was subsequently called as a witness by Jacob. Outside the hearing of the jury, Jacob's counsel offered exhibit 644, which contained the tape-recorded statement of Ingram to Beam. Counsel argued that it was

> important that the tape is played so that later the State can't argue that because [Ingram] forgot some specific important facts because he was excited or upset or anything like that, and the tape, again, would allow the jury to listen to his demeanor at the time the statement was given so they could, again, weigh any argument that may be made about why he may not be able to recall accurately the offense that occurred some two hours before that.

Jacob's counsel wanted the tape played to show that Ingram's demeanor at the time of his statement to Beam was normal, in order to rebut any argument by the State that because he was

excited, Ingram forgot to mention to Beam that he had seen someone drive by in a car. The State objected, and discussions continued outside the hearing of the jury. Defense counsel stated: "What I would like to do is play the tape up until — I'm not trying to get in inadmissible evidence. What I would be willing to do is to get up through his description of what occurred. In other words, what he told Officer Beam."

Jacob then resumed direct examination. Ingram was handed exhibit 455, which was the transcription of his taped statement to Beam. Ingram did not dispute that the transcription accurately reflected what Ingram told Beam. When asked whether in his taped statement he had referred to seeing a car or an individual after the shooting, Ingram responded that he had not. When asked about his demeanor at the time he gave the statement, Ingram stated that he was "shook up," nervous, and trembling, and that the tape recording of his statement would accurately reflect what he sounded like when the statement was taken.

Defense counsel then requested that part of the tape recording, from the *Miranda* warnings through Ingram's initial narrative to Beam as to what had happened, be played to the jury. The trial court ruled as follows: "I will give you leave — I won't receive the exhibit into evidence, but I will give you leave to play those portions, go through the Miranda." The jury then heard a portion of the tape of the interview between Ingram and Beam.

At the hearing on the motion for new trial, the trial court found the communication by the court to the jurors regarding the tape was improper, but that it was clear from the record that it was innocuous. The court found beyond a reasonable doubt that Jacob was in no way prejudiced by the communication and that any error was harmless.

Although the trial court relied upon our holding in *Simants v. State*, 202 Neb. 828, 277 N.W.2d 217 (1979), that an improper communication with a juror or jurors creates a rebuttable presumption of prejudice and that the burden is on the State to prove that the communication was not prejudicial, the rule governing communications between a trial court and jurors is set forth in *State v. Mahlin*, 236 Neb. 818, 823, 464 N.W.2d 312, 316 (1991):

"There is reversible error if the record affirmatively shows that defendant has been prejudiced by private communication between the trial court and jurors, and a new trial should be granted where the record is silent as to a possibility of prejudice, although reversal is not required if the record affirmatively shows communication had no tendency to influence the verdict."

From our review of the record, we conclude that the communication was improper but not prejudicial. The record does not affirmatively show that Jacob was prejudiced by the trial court's response to the jury about the tape. The record shows that the communication had no tendency to influence the verdict.

Jacob's counsel cross-examined Ingram and also called Ingram as a witness to point out the inconsistencies in his testimony. A portion of Ingram's taped statement was played to the jury, and the jury heard testimony by Ingram as to why he did not mention the car and its driver during the 6 a.m. interview and why he did not identify Jacob as the driver until he spoke with the police on August 3, 1989.

The trial court's comment reflected the fact that a certain piece of evidence was published but not entered into evidence. The previously played portions of the tape recording, like testimony of an actual witness at trial, are not to be reheard by jurors. Jurors must rely upon their memory of what they heard the witness say, be it from a live witness or a tape recording. See *Shiers v. Cowgill*, 157 Neb. 265, 59 N.W.2d 407 (1953) (practice of allowing official stenographer to read to jury his notes of testimony of witness, upon request made by jury which is allegedly in disagreement as to such witness' testimony, should not be encouraged).

The tape recording was offered to attack Ingram's credibility and was, therefore, impeachment. The jury was instructed regarding testimony admitted for impeachment purposes as follows:

You have heard testimony concerning statements allegedly made by witnesses prior to this trial which may be inconsistent with their testimony at this trial. This testimony has been admitted solely for impeachment purposes to aid you in estimating the credibility of the wit-

nesses and to determine the weight to be given to their testimony. You may consider it for that limited purpose only and not as evidence of the facts declared in the prior statements.

Thus, the jury was instructed by the trial court that it could consider the statement made by Ingram prior to trial for the limited purpose of determining the credibility of Ingram's testimony at trial and not as evidence of the facts set forth in the taped statement that was played. This was consistent with the court's ruling in response to Jacob's counsel's request to publish a portion of the tape to the jury. Outside the hearing of the jury, Jacob's counsel requested:

At this time, Your Honor, I would offer 644 and ask to publish it to the jury, the tape, to hear Mr. Ingram's voice.

. . . .

. . . As I said, we can go through, which will also show his voice and his demeanor. That's not going to be critical evidence as far as anything that the jury shouldn't hear. Then we'll finish it at the end of that sentence and stop it here.

The court responded: "I will give you leave — I won't receive the exhibit into evidence, but I will give you leave to play those portions, go through the Miranda." Since the communication had no tendency to influence the jury's verdict, we find this assignment of error to be without merit.

### FAILURE TO ADMIT TAPED STATEMENT

Jacob assigns as error that the trial court erred in failing to admit exhibit 644, Ingram's taped statement to the police. In all proceedings where Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules, not judicial discretion, except in those instances under the rules when judicial discretion is a factor involved in the admissibility of evidence. *State v. Merrill*, 252 Neb. 736, 566 N.W.2d 742 (1997). In the case of Ingram's taped statement, because it was not offered for the truth of the matter asserted, the statement would be governed generally by Neb. Evid. R. 402 and 403, Neb. Rev. Stat. §§ 27-402 and 27-403 (Reissue 1995). We have previously held that judicial discretion is a fac-

tor involved in admissibility of evidence under §§ 27-402 and 27-403. See, *State v. McBride*, 250 Neb. 636, 550 N.W.2d 659 (1996); *State v. Fahlk*, 246 Neb. 834, 524 N.W.2d 39 (1994). Therefore, we uphold the trial court's decision as to the admissibility of Ingram's taped statement unless the ruling is an abuse of discretion. See, e.g., *State v. Allen*, 252 Neb. 187, 560 N.W.2d 829 (1997). Judicial abuse of discretion means that the reasons or rulings of the trial court are clearly untenable, unfairly depriving a litigant of a substantial right, and denying a just result in matters submitted for disposition. *State v. Eona*, 248 Neb. 318, 534 N.W.2d 323 (1995).

The trial court did not abuse its discretion with regard to the tape recording of Ingram's statement. The court allowed that portion of the taped statement which defense counsel requested for the purpose of showing Ingram's demeanor in giving his statement to Beam. We find this assignment of error to be without merit.

### COURT AS WITNESS

Jacob assigns as error that the trial court acted as a witness. We disagree. During direct examination, Ingram identified Jacob as the person he saw drive by after the shootings. Jacob's counsel then stated to the court: "Judge, I agree he's identified Mr. Jacob." In response, the court stated: "All right. The record will so reflect." Jacob argues that this statement by the court constituted testimony as a witness, in violation of Neb. Evid. R. 605, Neb. Rev. Stat. § 27-605 (Reissue 1995). We find no merit to this assignment of error.

### EXCITED UTTERANCE

Jacob asserts that the trial court erred in admitting Gifford's testimony about Hopper's statement to Gifford regarding Jacob's visit on August 1, 1989. Jacob claims that the statement does not qualify under the excited utterance exception to the hearsay rule.

In *State v. Jacob*, 242 Neb. 176, 494 N.W.2d 109 (1993), faced with the same argument, we held that Hopper's statements to Gifford were admissible as excited utterances. All matters expressly or by necessary implication adjudicated by this court become the law of the case on remand for new trial and

will not be considered again unless it is shown that the facts presented at the second trial are materially and substantially different from the facts presented at the first trial. *Tank v. Peterson*, 228 Neb. 491, 423 N.W.2d 752 (1988). The burden of showing the material and substantial difference in the facts is on the party asserting the difference. *Id.*

In *Jacob, supra*, we noted that "[t]he record is unclear as to the exact time of Jacob's exchange with Hopper at Etherton's house, only revealing that it occurred sometime in the morning, i.e., presumably anytime before 12 noon." *Id.* at 187, 494 N.W.2d at 118. Thereafter, Hopper called Etherton and Sue Jacob (Jacob's mother) and arrived at work at approximately 1 p.m. The evidence showed that during the conversation with Gifford, Hopper appeared "flushed, very fidgety, and visibly upset," and that Gifford had never seen Hopper as agitated and angry as she was on August 1, 1989. See *id.* at 188, 494 N.W.2d at 118. We held that the statement was an excited utterance because "it is clear that Hopper exhibited observable manifestations that she made the statement while under the stress of excitement caused by Jacob's visit." *Id.* at 189, 494 N.W.2d at 119.

Jacob claims that in *Jacob, supra*, it appeared that Hopper's conversation with Gifford occurred approximately 1 hour after the incident with Jacob, while in the present case, the evidence establishes that the conversation occurred at least 4 hours after the incident with Jacob. In support of this contention, Jacob first argues that the evidence as to the time of Hopper's exchange with Gifford has changed from the first trial. During Jacob's second trial, Gifford testified that Hopper arrived in his office not very long after 1 p.m., in the "early afternoon." He testified that Hopper told him that after Jacob left and she locked the doors and windows, she called Etherton to let him know what had happened and then she called Jacob's mother. Gifford explained, "She was not there a long time, and then she left." On cross-examination, Gifford was confronted with a police report indicating that Hopper arrived around 3 p.m. and his prior deposition testimony that his memory probably would have been better at the time of the police report. He then admitted that he "would still be unsure of that time." On redirect

examination, however, Gifford clarified that he did not review the police report at the time it was made to make sure it was accurate and that it was still his "best recollection" that Hopper came in to see him shortly after 1 p.m. We conclude that Jacob has failed to prove that this evidence is substantially different from the facts presented at the first trial.

Jacob also claims that the evidence has changed as to the time Jacob visited Hopper and as to whether Hopper in fact could have consciously reflected on the event before speaking with Gifford. Sue Jacob testified during the second trial that she received a phone call from Hopper around 10 or 10:30 a.m. When asked whether Hopper sounded upset at the beginning of their phone conversation, Sue Jacob responded, "Yes, or concerned." At the hearing on Jacob's motion in limine to preclude the testimony of Gifford, Sue Jacob admitted that she did not remember the exact time of the conversation, but that she thought it was "between 10:00, 10:30, 11:00, in that vicinity." Sue Jacob was also confronted with prior deposition testimony in which she said that when Hopper first contacted her on the phone, Hopper was angry, upset, and talking fast. On redirect by Jacob's counsel, Sue Jacob agreed with the characterization that Hopper started the conversation concerned and excited, calmed down, and then left the conversation angry. At trial, Sue Jacob approximated that the conversation with Hopper lasted only 10 minutes. Thus, as in *State v. Jacob*, 242 Neb. 176, 494 N.W.2d 109 (1993), it is proper to say that the record is unclear as to the exact time of Jacob's exchange with Hopper at Etherton's house, although it can be concluded that it occurred sometime before noon.

Jacob also failed to show that Sue Jacob's testimony that Hopper temporarily calmed down presents a material and substantial change from the facts presented in the first trial. In both trials, the facts show that after two short phone conversations, Hopper arrived at work very agitated and upset. She was, as described in *Jacob, supra*, flushed, very fidgety, and visibly upset. In *Jacob*, we held that despite the contention that Hopper had ample opportunity to reflect upon the event before communicating it to Gifford, the facts showed clearly that Hopper exhibited observable manifestations that she made the state-

ment while under the stress of excitement caused by Jacob's visit. Our holding in *Jacob* that Hopper's statement to Gifford was admissible as an excited utterance is the law of the case.

### PROFFERED TESTIMONY OF OCKINGA AND SUE JACOB

Jacob claims the trial court erred in sustaining the State's objection to the testimony of witnesses Ockinga (Hopper's sister) and Sue Jacob regarding conversations they had with Hopper. Jacob's counsel attempted to introduce the testimony of Ockinga and Sue Jacob to rebut the State's argument that Jacob killed Hopper in a jealous rage, because the statements were admissible under Neb. Evid. R. 803(2), Neb. Rev. Stat. § 27-803(2) (Reissue 1995), as showing Hopper's state of mind. The court held that the state of mind of the victim was not relevant and, therefore, not admissible.

Jacob's offer of proof stated that Ockinga would testify that Hopper had told Ockinga she was frustrated with her relationship with Jacob because he was not paying much attention to her. Certain proposed testimony by Sue Jacob was similarly meant to show Hopper's discontent with her relationship with Jacob.

The exercise of judicial discretion is implicit in determinations of relevancy, and the trial court's decision will not be reversed absent an abuse of discretion. *State v. McBride*, 250 Neb. 636, 550 N.W.2d 659 (1996). We find that the trial court did not abuse its discretion in excluding this testimony.

### PROSECUTORIAL MISCONDUCT IN CLOSING ARGUMENTS

Jacob claims the trial court erred in overruling his motion for a mistrial and motion for a new trial based on prosecutorial misconduct during closing arguments. The following statement was made by the prosecution during closing arguments:

Credibility, ladies and gentlemen. Does it make sense? As you judge credibility, ladies and gentlemen, recall. Recall. Who has had five years to think of his answers, five years to run through all of this. Five years to prepare. Who sat through this trial and heard every witness and every question. Who sat on the stand and didn't want to answer the question that was posed, he wanted to give his own answer. Credibility, ladies and gentlemen. That's your job to decide.

Immediately following this argument, Jacob moved for mistrial based on his right to remain silent. The trial court overruled the motion, finding Jacob's objection untimely and not sufficiently specific. The court also concluded that the remarks were not prejudicial, did not mislead or unduly influence the jury, and were simply remarks based on inferences and deductions drawn from the evidence. The court also concluded that if any error had occurred, it was harmless.

Jacob's objection and assertion that he had a right to remain silent immediately following closing arguments were timely and were sufficient to preserve the objection. See *Graham v. Simplex Motor Rebuilders*, 191 Neb. 320, 215 N.W.2d 641 (1974). In order to preserve, as a ground of appeal, an opponent's misconduct during closing argument, the aggrieved party must have objected to improper remarks no later than at the conclusion of the argument. *Wolfe v. Abraham*, 244 Neb. 337, 506 N.W.2d 692 (1993).

Jacob now argues that in addition to violating his right to remain silent, the statement violated due process and his Sixth Amendment rights to confrontation and effective assistance of counsel. Since these issues were not presented to or decided by the trial court, we consider only the right to remain silent. An issue not presented to or decided by the trial court is not an appropriate issue for consideration on appeal. *State v. Russell*, 248 Neb. 723, 539 N.W.2d 8 (1995).

The decision whether to grant a motion for mistrial is within the discretion of the trial court and will be upheld on appeal absent a showing of abuse of discretion. *State v. Anderson*, 252 Neb. 675, 564 N.W.2d 581 (1997). In *Doyle v. Ohio*, 426 U.S. 610, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976), the Court held that a prosecutor's use of a defendant's postarrest, post-*Miranda* silence is fundamentally unfair because *Miranda* warnings imply not only that a person has the right to remain silent, but that his or her silence will not be used against him or her as evidence of guilt. That is not the factual situation that occurred in this case.

Jacob took the stand and offered his version of the facts. The State's closing argument implied that in evaluating the credibility of Jacob's testimony, the jury should consider that Jacob had

the benefit of first hearing all the witnesses' testimony and had 5 years to prepare his testimony.

Relying on *State v. Lofquest*, 227 Neb. 567, 418 N.W.2d 595 (1988), Jacob argues that the prosecution's comments on his credibility were error and cannot be harmless. We disagree. The facts in this case are not analogous to *Lofquest*, in which the defendant was cross-examined with a series of questions regarding his failure to previously tell his story to law enforcement. The prosecution then asked the defendant if he understood that if he had told law enforcement officials his story nearer to the time of the incident, they would have been able to go to the scene and look for evidence to corroborate his story. After a defense objection, the prosecutor addressed the court, with the jury present, stating: " 'I think it affects his credibility if he gave no statements to the officers prior to this time.' " *Id.* at 569, 418 N.W.2d at 596. The trial court allowed the questioning and gave no curative instruction. In closing arguments, the prosecutor reiterated that a proper investigation could have been conducted if the defendant would have spoken sooner, and the prosecutor asked the jury: " '[W]ouldn't you tell them? I would.' " *Id.* at 570, 418 N.W.2d at 597. We held that the error was not harmless. Here, there was no comment on Jacob's postarrest silence, and therefore, the trial court did not abuse its discretion in overruling Jacob's motion for mistrial. We find nothing in the argument that can be construed as a comment on Jacob's postarrest silence. This assignment of error is without merit.

### MOTION TO STRIKE WITNESS FAULKERSON

Jacob asserts that the trial court erred in overruling his motion to strike Faulkerson as a witness because allowing him to testify denied Jacob his rights to confrontation and due process and that the probative value of Faulkerson's testimony was substantially outweighed by the danger of unfair prejudice to Jacob. Jacob first claims he was denied due process because the State should have known that Faulkerson's testimony was false. The record does not support this. The cases relied upon by Jacob—*Giglio v. United States*, 405 U.S. 150, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972), and *Napue v. Illinois*, 360 U.S. 264, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959)—concern testimony elicited

and argument made by the prosecution regarding the witness' relationship with the prosecution, which the prosecution affirmatively knew to be false.

The credibility of a witness and the weight to be given that witness' testimony are issues for the jury to resolve. *State v. Kinser*, 252 Neb. 600, 567 N.W.2d 287 (1997). In reviewing a criminal conviction, it is not the province of an appellate court to resolve conflicts in the evidence, pass on the credibility of witnesses, determine the plausibility of explanations, or reweigh the evidence. Such matters are for the finder of fact, and the verdict of the jury must be sustained if, taking the view most favorable to the State, there is sufficient evidence to support it. *State v. Marks*, 248 Neb. 592, 537 N.W.2d 339 (1995). There being no evidence to support the claim that the State knew Faulkerson's testimony was false, the determination of credibility is for the jury.

Second, Jacob argues that the admission of Faulkerson's testimony denied Jacob his right of confrontation. Jacob's argument is as follows:

> The acts of the prosecutors in this case placed the Defendant in a dilemma: either he had to give up his right to confrontation of a key prosecution witness regarding the witness' motive to fabricate his testimony or he had to give up his right to a fair trial by exposing the second jury to the "dying declaration" evidence, this Court's reversal of a prior conviction, and the fact that defendant's brother was in prison. It is intolerable that one constitutional right should have to be surrendered in order to assert another. Simmons v. United States, 390 U.S. 377, 88 S. Ct. 967, 19 L. Ed. 2d 1247 (1968). The denial of the Defendant's right to confront Faulkerson could not be harmless error because Faulkerson's testimony involved an alleged admission by the Defendant.

Brief for appellant at 72-73. We disagree. Jacob was not denied his right to confront Faulkerson, because Faulkerson appeared as a witness in open court and was subject to cross-examination if Jacob so chose. We find no merit in this argument.

Finally, Jacob complains that Faulkerson's testimony should not have been permitted under § 27-403. Jacob offers no author-

ity for this position. We conclude that the testimony and observations of Faulkerson, who was subject to cross-examination on the subject of credibility, although prejudicial to Jacob, were not unfairly prejudicial and therefore not excludable under § 27-403. See *State v. Perrigo*, 244 Neb. 990, 510 N.W.2d 304 (1994).

We find no merit to Jacob's assignment of error that the trial court erred in allowing Faulkerson's testimony.

### FAILURE TO ADMIT VIDEOTAPED STATEMENT OF PHIFER

Jacob contends that the trial court deprived him of his due process right to present evidence when it refused to admit exhibit 673, a videotaped statement given by Phifer to Investigator Richard Doetker of the Lincoln Police Department on August 16, 1989, in Brewer, Maine. Phifer was working at Intown Auto Sales the day Jacob attempted to sell his van. Jacob argued that the videotape was important to show that he wanted a reasonable price for the van and to show his innocent behavior prior to the arrest.

Jacob asserts that exhibit 673 was admissible based on the residual exception to hearsay under Neb. Evid. R. 804(2)(e), Neb. Rev. Stat. § 27-804(2)(e) (Reissue 1995). The trial court held that Jacob had made a showing that Phifer was unavailable, but that the videotaped statement was hearsay and did not come within the residual exception to the hearsay rule.

The residual hearsay exception is to be used rarely and only in exceptional circumstances. *State v. Plant*, 236 Neb. 317, 461 N.W.2d 253 (1990). An appellate court will affirm the trial court's ruling on whether evidence is admissible under § 27-804(2)(e) unless the trial court has abused its discretion. See *State v. Toney*, 243 Neb. 237, 498 N.W.2d 544 (1993). We conclude that the trial court did not abuse its discretion in failing to admit the videotaped statement of Phifer.

### MOTION IN LIMINE ON EVIDENCE OF FLIGHT

Jacob argues that the trial court erred in overruling his motion in limine to prohibit the State from introducing evidence that Jacob left the city of Lincoln on August 2, 1989. Jacob claims that the evidence fails to support the characterization of his conduct as flight because there was allegedly no evidence

that he made any deliberate attempt to conceal his whereabouts or identity and that other conduct prior to his arrest indicates he was unaware that there was a warrant for his arrest.

To aid in determining the innocence or guilt of a defendant, a jury may consider the defendant's voluntary flight immediately or soon after the occurrence of a crime. *State v. Tucker*, 242 Neb. 336, 494 N.W.2d 572 (1993). Jacob appears to contend, however, that in order for evidence of flight to be admissible, the State must first prove by clear and convincing evidence that the accused departed with consciousness of guilt. Jacob relies on *State v. Lincoln*, 183 Neb. 770, 164 N.W.2d 470 (1969). In *Lincoln*, we held that for departure to take on the legal significance of flight, there must be circumstances present and unexplained which, in conjunction with the leaving, reasonably justify an inference that it was done with a consciousness of guilt and pursuant to an effort to avoid apprehension or prosecution based on that guilt.

In *State v. Samuels*, 205 Neb. 585, 289 N.W.2d 183 (1980), we held that despite the fact that there was evidence from which it could be concluded that the defendant ran because he was frightened or to avoid detection, it was for the jury to decide whether his departure constituted flight. We have never held that before evidence of departure may be admitted, it must be proved by clear and convincing evidence that the defendant had consciousness of guilt during such departure. If the evidence is sufficient to support a jury's determination that the departure constituted flight, it is proper to submit such evidence.

We conclude that the evidence presented at trial was sufficient to support such a finding, and therefore, we determine that this assignment of error is without merit.

### JURY INSTRUCTION ON FLIGHT

Jacob also argues that the trial court erred in failing to give his proposed instruction on flight. The proposed instruction stated:

The defendant's voluntary departure from the State of Nebraska does not warrant an inference of guilt, unless you find, beyond a reasonable doubt, circumstances present and unexplained which, in conjunction with the leav-

ing, reasonably justify that it was done with a consciousness of guilt and pursuant to an effort to avoid apprehension or prosecution based on that guilt.

To establish reversible error from a court's refusal to give a requested instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction is warranted by the evidence, and (3) the appellant was prejudiced by the court's refusal to give the tendered instruction. *State v. Trackwell*, 244 Neb. 925, 509 N.W.2d 638 (1994). Flight is circumstantial evidence that may be used by the trier of fact to establish guilt beyond a reasonable doubt. With regard to circumstantial evidence, the State is not required to disprove every hypothesis but that of guilt. See *State v. Piskorski*, 218 Neb. 543, 357 N.W.2d 206 (1984). The State does not need to first establish beyond a reasonable doubt that a circumstance exists before it can present evidence of such circumstance to the jury. The instruction is not a correct statement of the law, and the trial court did not err in failing to give it to the jury.

### SUFFICIENCY OF EVIDENCE

Jacob contends that the evidence was insufficient to support his convictions because without the testimony of Faulkerson and Gifford, which he claims is inadmissible, the State would not have been able to meet the burden of proof necessary to submit the case to the jury. Having already found that the testimony of Faulkerson and Gifford was properly admitted, we conclude from our review of the record that the evidence was sufficient to sustain the convictions. We find no merit to this assignment of error.

### CUMULATIVE EFFECT OF ERRORS

Jacob argues that the cumulative effect of all the above errors deprived him of his constitutional right to a public trial by an impartial jury. In *State v. Kern*, 224 Neb. 177, 397 N.W.2d 23 (1986), we held that while any one of several errors may not, in and of itself, warrant a reversal, if all of the errors in the aggregate establish that the defendant did not receive a fair trial, a new trial must be granted. From our review of the record, we conclude that there were no cumulative errors. We find no merit in this argument.

## DOUBLE JEOPARDY

Prior to trial, Jacob's counsel moved to dismiss on double jeopardy grounds because the State was attempting to use evidence that was or should have been inadmissible from the first trial. Jacob now argues in his pro se supplemental brief that the trial court erred in denying the motion to dismiss on double jeopardy grounds because of prosecutorial misconduct. None of the alleged bases for such conduct were argued to the trial court at the time counsel moved to dismiss on double jeopardy grounds. An issue not presented to or decided by the trial court is not an appropriate issue for consideration on appeal. *Hanigan v. Trumble*, 252 Neb. 376, 562 N.W.2d 526 (1997); *State v. Russell*, 248 Neb. 723, 539 N.W.2d 8 (1995). Because the issue of prosecutorial misconduct was neither presented to nor decided by the trial court in ruling upon the motion to dismiss, we find no merit to this assignment of error.

## PROFFERED EVIDENCE OF ETHERTON'S CHARACTER

Jacob's pro se brief also assigns error in the trial court's failure to allow evidence of Etherton's alleged jealous violence toward women. The State was granted a motion in limine to exclude any evidence regarding the character of Etherton because Jacob was not claiming self-defense. The court thus excluded the proffered testimony of Patricia Etherton and Patricia Einspahr, Etherton's ex-wife and former girl friend respectively, who would have testified as to his previous threats of violence toward them. Jacob argues that this evidence should have been admitted under Neb. Evid. R. 404(2), Neb. Rev. Stat. § 27-404(2) (Reissue 1995), to show motive for Hopper to fabricate the story she told Gifford about Jacob pushing his way into her home on August 1, 1989. We find that Etherton's alleged acts of threatening women in previous relationships have no probative value in showing that Hopper had a motive to lie to Gifford regarding Jacob's visit. This assignment of error is without merit.

## INGRAM'S IDENTIFICATION TESTIMONY

Jacob's pro se brief argues that the trial court erred in allowing Ingram's identification testimony into evidence. Jacob asserts that Ingram's testimony is unreliable, is the result of a

suggestive "showup" at the preliminary hearing for the first trial, and is based on seeing Jacob identified as a suspect on television and in the newspaper. Prior to trial, the court overruled Jacob's motion to suppress the eyewitness identification by Ingram based upon its alleged suggestive nature. The court again overruled an objection to Ingram's identification during trial.

During trial, Ingram testified that when he saw a picture of Jacob on the news, he called the police to tell them that he had seen that person drive by shortly after the shooting. He clarified, however, that his testimony identifying Jacob as the man who drove by was based on what he saw while standing in front of the neighbor's house. The admissibility of evidence is reviewed for an abuse of discretion where the Nebraska Rules of Evidence commit the evidentiary question at issue to the discretion of the trial court. *State v. McBride*, 250 Neb. 636, 550 N.W.2d 659 (1996). The trial court did not abuse its discretion in allowing Ingram's testimony.

### FAILURE TO APPOINT BALLISTICS EXPERT

Jacob alleges that the trial court erred in not providing him with a ballistics expert. According to Jacob, he had hired a ballistic expert, a Mr. Kreps, prior to his first trial. Kreps allegedly concluded that the physical evidence did not comport with Ingram's description of the shooting. Accordingly, Jacob argues that the appointment of a ballistics expert was necessary to impeach Ingram's credibility.

Before trial, Jacob's counsel requested approval to obtain a ballistics expert, asserting that such expert could refute the testimony of Ingram. At that time, counsel made reference to a person who had previously been obtained by Jacob; however, counsel indicated that the individual did not have the credentials to qualify as a ballistics expert. The trial court overruled the motion. The right of an indigent defendant to the appointment of an expert witness at the State's expense generally rests in the discretion of the trial court. *State v. Grimes*, 246 Neb. 473, 519 N.W.2d 507 (1994). We find that the court did not abuse its discretion in refusing to appoint a ballistics expert on Jacob's behalf.

## INEFFECTIVE ASSISTANCE OF COUNSEL

Under an independent heading, Jacob contends that his trial counsel was ineffective in failing to sufficiently argue during the hearing on the motion to appoint a ballistics expert. Specifically, Jacob asserts that counsel erred in failing to present Kreps' report to the court and in arguing that there was no showing of any need for a ballistics expert. We disagree. Trial counsel argued to the court that a ballistics expert would be able to refute certain testimony by Ingram, and counsel relayed Jacob's insistence that the appointment of a ballistics expert was "imperative." It appears that counsel did not introduce Kreps' report because counsel believed that Kreps did not have the credentials to qualify as an expert. We cannot conclude that this rendered counsel's performance deficient.

In addition to the argument that trial counsel failed to properly present the need for a ballistics expert, Jacob makes numerous references to alleged ineffectiveness of counsel under the heading "The District Court erred in not granting the defendant a hearing on his claims of Ineffective Assistance of Counsel." Supplemental brief for appellant at 22. This heading corresponds to one of his assignments of error. Jacob begins this section with the following statement: "I raise the issue of ineffective assistance of counsel, now, to overcome any claim of having waived the following or other errors made by trial or other counsel that would prevent me from proceeding to the Federal Court on a writ of Habeas Corpus." *Id.*

Jacob raises these ineffective assistance of counsel claims for the first time before this court. Claims of ineffective assistance of counsel raised for the first time on direct appeal do not require dismissal ipso facto; the determining factor is whether the record is sufficient to adequately review the question. *State v. Cody*, 248 Neb. 683, 539 N.W.2d 18 (1995). When an issue has not been raised or ruled on at the trial level and the matter necessitates an evidentiary hearing, an appellate court will not address the matter on direct appeal. *Id.* From the record, we cannot say whether or not an evidentiary hearing on these issues is necessary, and therefore, we do not address this argument on direct appeal.

## COUNTY ATTORNEY AS WITNESS

Jacob assigns as error that the trial court erred in not removing the Lancaster County Attorney from this case and in not allowing the county attorney to be called as a witness on the motion to dismiss. Jacob contends the court thereby denied him his right to compel the attendance of witnesses on his behalf, as guaranteed by the Sixth Amendment to the U.S. Constitution and article I, § 11, of the Nebraska Constitution. In his argument for this assignment of error, Jacob makes vague reference to the admissibility of a "9mm gun document" and alleged comments by the county attorney during a pretrial hearing for his first trial. See supplemental brief for appellant at 14. We cannot discern Jacob's argument on this point, and therefore, we do not address it.

## ERRORS NOT DISCUSSED

Assignments of error Nos. 24 and 25 are not discussed in Jacob's brief. Therefore, we do not address them.

## CONCLUSION

For the foregoing reasons, we affirm the judgment of the district court.

AFFIRMED.

CAPORALE, J., dissenting.

I am distressed to note that this is the third occasion in the short space of 2 years in which we have been made aware that our trial courts are not providing proper jury room security. *State v. Anderson*, 252 Neb. 675, 564 N.W.2d 581 (1997) (newspaper found in Douglas County jury room); *State v. Nissen*, 252 Neb. 51, 560 N.W.2d 157 (1997) (spouse permitted to spend night with sequestered Richardson County juror). While it is time to remedy that situation, I write to respectfully dissent from that portion of the majority's opinion which holds that the trial court's improper ex parte instruction to the jury did not prejudice the defendant, Steven Jacob.

As the majority opinion notes, the only purpose for playing a portion of the tape-recorded statement was to impeach John Ingram's explanation that because he was "shook up," nervous, and trembling while giving the statement, he failed to mention the light-colored, slowly traveling vehicle later determined to

have been driven by Jacob. In response to the jury's concern that it was unable to find the tape recording among the items of evidence it had been given, the trial court advised not that "the language contained in the portion of the tape recording played had been received in evidence, but the tape itself had not," but instead wrote that "[a] portion of the tape was played in court but not received in evidence." Said another way, the court instructed the jury that the exact portion of the tape recording played in court was not received in evidence.

The majority's interpretation of the trial court's message is contrary to the clear and ordinary meaning of what the court wrote and is arrived at by considering discussions made outside the presence of the jury. The propriety of particular remarks made by a court to a jury after its retirement for deliberation must be measured by the language employed, not by the meaning the court intended. See *Neujahr v. Neujahr*, 223 Neb. 722, 393 N.W.2d 47 (1986) (meaning of judgment determined from language, not what parties thought judge meant or what judge thought he or she meant).

Moreover, even if the trial court's ex parte instruction were open to multiple interpretations, we would not be free to assume that the jury accepted the legally correct interpretation. An instruction to a jury given in language which is susceptible of two interpretations, one correct in point of law and the other incorrect, and which may have misled the jury to the prejudice of the complaining party, is a misdirection, for which the judgment will be reversed. *Frederick v. Ballard*, 16 Neb. 559, 20 N.W. 870 (1884).

Contrary to the majority's reasoning, the prejudicial nature of the trial court's improvident ex parte instruction is not overcome by its instruction concerning the use of testimony admitted solely for impeachment purposes. What is at issue here is not the testimony solicited by Jacob about Ingram's tape-recorded statement, but the actual tape-recorded statement itself. In that regard, the trial court properly instructed that the jury must be governed solely by the evidence introduced. See *Loving v. Baker's Supermarkets*, 238 Neb. 727, 472 N.W.2d 695 (1991).

In short, the trial court's ex parte instruction prejudicially deprived Jacob of his 6th and 14th Amendment right to present

a defense. I would therefore reverse the trial court's judgment and remand the cause for a new trial.