State of Nebraska, appellee, v.
Jason William Custer, appellant.
___ N.W.2d ___

Filed November 13, 2015.    No. S-14-332.

1. **Jury Instructions: Proof: Appeal and Error.** To establish reversible error from a court's refusal to give a requested instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction is warranted by the evidence, and (3) the appellant was prejudiced by the court's refusal to give the tendered instruction.

2. **Jury Instructions: Appeal and Error.** Whether jury instructions are correct is a question of law, which an appellate court resolves independently of the lower court's decision.

3. **Convictions: Evidence: Appeal and Error.** In reviewing a claim that the evidence was insufficient to support a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the evidence admitted at trial, viewed and construed most favorably to the State, is sufficient to support the conviction.

4. **Trial: Prosecuting Attorneys: Appeal and Error.** When a defendant has not preserved a claim of prosecutorial misconduct for direct appeal, an appellate court will review the record only for plain error.

5. **Sentences: Appeal and Error.** An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court.

6. **Sentences.** Whether a defendant is entitled to credit for time served and in what amount are questions of law.

7. **Records: Appeal and Error.** It is incumbent upon an appellant to supply a record which supports his or her appeal.

8. **Self-Defense.** The choice of evils defense provided by Neb. Rev. Stat. § 28-1407 (Reissue 2008) requires that a defendant (1) acts to avoid a greater harm; (2) reasonably believes that the particular action is necessary to avoid a specific and immediate harm; and (3) reasonably believes that the selected action is the least harmful alternative to avoid the harm, either actual or reasonably believed by the defendant to be certain to occur.

9. **Homicide: Intent: Time.** No particular length of time for premeditation is required, provided that the intent to kill is formed before the act is committed and not simultaneously with the act that caused the death. The duration of time required to establish premeditation may be so short that it is instantaneous.

10. **Trial: Motions for Mistrial.** When a party has knowledge during trial of irregularity or misconduct, the party must timely assert his or her right to a mistrial.

11. **Motions for Mistrial: Prosecuting Attorneys: Waiver: Appeal and Error.** A party who fails to make a timely motion for mistrial based on prosecutorial misconduct waives the right to assert on appeal that the court erred in not declaring a mistrial due to such prosecutorial misconduct.

12. **Appeal and Error.** An appellate court may find plain error on appeal when an error unasserted or uncomplained of at trial, but plainly evident from the record, prejudicially affects a litigant's substantial right and, if uncorrected, would result in damage to the integrity, reputation, and fairness of the judicial process.

13. **Trial: Prosecuting Attorneys: Words and Phrases.** Prosecutorial misconduct encompasses conduct that violates legal or ethical standards for various contexts because the conduct will or may undermine a defendant's right to a fair trial.

14. **Trial: Prosecuting Attorneys.** In assessing allegations of prosecutorial misconduct in closing arguments, a court first determines whether the prosecutor's remarks were improper. It is then necessary to determine the extent to which the improper remarks had a prejudicial effect on the defendant's right to a fair trial.

15. **Trial: Prosecuting Attorneys: Juries.** Prosecutors are charged with the duty to conduct criminal trials in such a manner that the accused may have a fair and impartial trial, and prosecutors are not to inflame the prejudices or excite the passions of the jury against the accused.

16. ____: ____: ____. A prosecutor's conduct that does not mislead and unduly influence the jury does not constitute misconduct.

17. **Trial: Confessions: Miranda Rights: Impeachment.** The State may not seek to impeach a defendant's exculpatory story, told for the first

time at trial, by cross-examining the defendant about his or her failure to have told the story after receiving *Miranda* warnings at the time of the defendant's arrest.

18. **Sentences: Probation and Parole.** A sentence of life imprisonment "without the possibility of parole" is erroneous, but not void.

19. **Sentences: Time.** A sentence validly imposed takes effect from the time it is pronounced.

20. **Sentences.** When a valid sentence has been put into execution, the trial court cannot modify, amend, or revise it in any way, either during or after the term or session of court at which the sentence was imposed.

21. **Courts: Sentences.** Where a portion of a sentence is valid and a portion is invalid or erroneous, the court has authority to modify or revise the sentence by removing the invalid or erroneous portion of the sentence if the remaining portion of the sentence constitutes a complete valid sentence.

22. **Sentences.** When imposing a sentence, a sentencing judge should consider the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense, and (8) the violence involved in the commission of the crime.

23. ____. The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life.

24. **Homicide: Sentences.** When a defendant is sentenced to life imprisonment for first degree murder, the defendant is not entitled to credit for time served in custodial detention pending trial and sentence; however, when the defendant receives a sentence consecutive to the life sentence that has maximum and minimum terms, the defendant is entitled to receive credit for time served against the consecutive sentence.

25. **Sentences.** A sentencing judge must separately determine, state, and grant the amount of credit on the defendant's sentence to which the defendant is entitled.

26. ____. When consecutive sentences are imposed for two or more offenses, periods of presentence incarceration may be credited only against the aggregate of all terms imposed.

Appeal from the District Court for Cheyenne County: Derek C. Weimer, Judge. Affirmed as modified.

James R. Mowbray and Sarah P. Newell, of Nebraska Commission on Public Advocacy, for appellant.

Douglas J. Peterson, Attorney General, and Melissa R. Vincent for appellee.

HEAVICAN, C.J., WRIGHT, CONNOLLY, McCORMACK, MILLER-LERMAN, CASSEL, and STACY, JJ.

MILLER-LERMAN, J.

## NATURE OF CASE

Jason William Custer appeals his convictions and sentences for first degree murder, use of a firearm to commit a felony, and being a felon in possession of a firearm. We affirm Custer's convictions, and we affirm his sentences as modified.

## STATEMENT OF FACTS

The charges against Custer arose from an incident in which he shot and killed Adam McCormick outside a residence in Sidney, Nebraska, on November 3, 2012. In the information filed in the district court for Cheyenne County, Custer was originally charged with second degree murder and use of a firearm to commit a felony. The information was amended to upgrade the murder charge to first degree and to add a charge of being a felon in possession of a firearm. Custer was alleged to be a habitual criminal, but the State ultimately chose not to pursue the habitual criminal enhancement.

Custer grew up in Chico, California, where he met and became friends with Billy Fields. In 2012, Custer decided to move to Humboldt, Nebraska, where his son and his son's mother lived. Fields was then living in Sidney with his girlfriend, Amber Davis. Fields invited Custer to stay with him and Davis for a time while he was in the process of moving to Humboldt. Custer arrived in Sidney on October 5. While in Sidney, Custer met various friends of Davis, including McCormick and Syrus Leal.

After Davis told Custer and Fields they needed to move out of her house, Fields arranged for the two to stay at another friend's apartment. At around this time, in mid-October, McCormick gave Custer $150. Although Custer testified that the money was a loan to help Custer pay his share of rent and utilities at the new apartment, Fields and Leal testified that McCormick gave Custer the money to purchase drugs and that after Custer failed to deliver the drugs, McCormick wanted his money back. Custer testified that he intended to pay McCormick back after he received an unemployment check on October 16, 2012, but that he ended up using the money from the check to pay other expenses. On or around October 20, McCormick came to the apartment where Custer and Fields were staying to collect the money. After Custer told McCormick he would pay him from his next check, Fields, who was upset that McCormick had come to confront Custer, told McCormick that he would pay McCormick by the end of the week. In the following days, McCormick exchanged threatening text messages and telephone calls with Custer and Fields.

On or about October 26, 2012, Custer and Fields attended Halloween parties at some local bars. While they were walking between bars, McCormick confronted them, demanding his money. Fields testified that when McCormick approached them, it looked like McCormick was reaching into his pocket for something, and that Fields thought it was a knife that he knew McCormick carried. Custer and Fields told McCormick they could not repay the $150 at that time, but in order to calm McCormick, Fields paid him $40 for another debt he owed. Fields testified that he later met up with Leal, who told him that the money McCormick gave Custer was actually Leal's and that the money should be repaid to him rather than to McCormick. Custer thought the matter had been resolved by agreeing to pay Leal, but McCormick later sent text messages to Custer and Fields suggesting that the matter could be resolved if they both left town.

A few days later, on November 1, 2012, McCormick sent Fields text messages threatening physical violence if the debt was not repaid soon. The text messages prompted Custer to arrange with McCormick to meet in a park for a fight. Custer and Fields went to the park at the arranged time. McCormick did not show up, but he continued to exchange confrontational text messages and telephone calls with Custer and Fields.

Custer and Fields went to Davis' house that night and told her about the ongoing conflict with McCormick. Other friends of Davis were at her house and heard about the conflict. Evidence at trial showed that the gun that was later used to shoot McCormick belonged to one of Davis' friends, but there was a conflict in the evidence as to how the gun came into Custer's possession. Fields testified that at Davis' house on November 1, 2012, Custer had talked to this friend about obtaining a gun and that after the shooting, Custer told Fields that prior to the shooting, he had kept the gun stashed in a culvert behind the apartment building where they were staying. In contrast, as will be discussed further below, Custer testified that he found the gun in Fields' truck immediately before the shooting and that he had not known before that time that the gun was in the truck.

The next night, November 2, 2012, Davis hosted a gathering at her house. A conflict arose when Davis saw that McCormick had come to her house with Leal. Davis insisted that McCormick leave. Davis sent text messages to Custer and Fields, who were not at Davis' house, letting them know about her confrontation with McCormick. She also let them know that the gathering was relocating to Leal's house, that McCormick would be there, and that although Custer and Fields should not fight McCormick there, they could "be waiting and watching for him." The conflict between Davis and McCormick continued at Leal's home. Throughout the evening, Davis updated Custer and Fields through text messages and telephone calls regarding McCormick's activities and whereabouts. Around 11:20 p.m., Custer responded to one of Davis' updates with a

text message stating that he and Fields were coming over to handle matters with McCormick.

Custer testified that throughout the night of November 2, 2012, he had also been exchanging text messages and telephone calls with McCormick and that although Custer tried to explain to McCormick that Fields was going to repay the money, McCormick continued to threaten him. Around 11:35 p.m., Custer asked McCormick whether they could "FINISH THIS RIGHT NOW ONE ON ONE." McCormick responded in the affirmative about 15 minutes later. In the same timeframe, Custer was exchanging texts with Davis to see whether anyone at Leal's home would have a problem if Custer came there to resolve things with McCormick. Custer testified that in light of mixed messages he received from both Davis and McCormick, he determined it would be better to wait until McCormick left and then come to resolve things with Leal instead of with McCormick.

Shortly after midnight on November 3, 2012, Davis texted Custer saying that McCormick was leaving the gathering at Leal's house. Custer borrowed Fields' truck to drive to Leal's house. Fields did not accompany Custer. When Custer arrived at Leal's house, he saw that McCormick, Leal, and Joshua Wright were standing outside on the lawn. Thereafter, an incident ensued in which Custer shot McCormick twice. The testimony at trial presented differing stories regarding the incident; therefore, Custer's testimony regarding the incident will be presented herein after discussion of Leal's and Wright's testimony.

Leal testified that after midnight on November 3, 2012, he, McCormick, and Wright were leaving the house; Wright was going to walk home, and Leal was going to give McCormick a ride home. As they were leaving, a truck pulled up to the house. When Leal saw the truck arrive, he thought it was Fields until he heard Custer call McCormick's name. Custer left the truck idling with the lights on while he got out of the truck and headed straight toward McCormick. Leal did not see

a gun but as soon as McCormick responded to Custer's calling his name, Leal heard a shot and saw McCormick buckle over. Leal heard another shot 1 or 2 seconds after the first shot. Leal went to attend to McCormick; he tried to catch McCormick's fall, but McCormick was already on the ground. Leal looked up and saw that Custer was almost back to the truck. Leal ran toward the truck and punched at Custer through the open window. Leal saw a gun on the seat next to Custer as Custer drove away in the truck. Leal then turned to see McCormick trying to walk around Leal's Jeep, which was parked in the driveway. By the time Leal reached McCormick, he was on the ground again.

Wright testified that he, Leal, and McCormick were standing in front of Leal's house smoking after midnight on November 3, 2012, when a truck pulled up and stopped in the street. Wright did not recognize the truck, but one of the other men said it belonged to Fields. Wright started to walk toward the truck because he knew about the tension between McCormick and Fields and he wanted to tell Fields to "chill out." The truck was still running with its lights on. A man got out of the truck, and Wright realized that it was not Fields and that, instead, it was Custer. Custer walked toward the front door of the house. At first Wright did not see anything in Custer's hands, but when Custer picked up his hands, Wright saw that he had a black assault rifle. Custer raised the rifle to his shoulder, and Wright moved to escape. Wright heard Custer call for McCormick, and then he heard a shot. Wright did not see where the shot had been fired because he was trying to escape. Wright heard another shot 1 or 2 seconds later, and then he saw Custer return to the truck. Wright saw Leal run to the truck and punch Custer before the truck left quickly. After he saw the truck leave, Wright started to run home, but when he heard Leal yell for him, he ran to the driveway where he saw McCormick on the ground. McCormick was unresponsive and bleeding, so Wright called for emergency assistance.

Other evidence presented by the State indicated that the bullet from the second shot entered McCormick's body under the left arm, continued in a downward trajectory, nicking a rib and perforating McCormick's lower left lung, esophagus, and liver, and exited his right side. McCormick died as a result of the gunshot wounds. In addition, an officer who arrived at the scene shortly after the shooting testified that he searched McCormick's pockets and that he found a pocketknife inside McCormick's front left pants pocket. The officer testified that when he found the pocketknife, it was closed up and clasped and was all the way inside the pocket. The officer further testified that he did not find any other weapon in McCormick's proximity.

Custer testified in his own defense at trial. He testified that when he arrived at Leal's house, he was confused that McCormick was still there and that he became concerned he was being set up. Custer therefore retrieved a gun that was in the back seat of the truck. Custer testified that he did not know that the gun was there until after he became concerned about a setup and started looking through the truck to find something to protect himself. Custer concealed the gun under his coat as he got out of the truck. As he walked up the driveway, he told McCormick that he was there "to talk so we can settle this." Custer testified that McCormick replied, "yeah, I'm going to settle it," and that then McCormick pulled out a knife and rushed at Custer. Custer testified that he backed up but ran into a Jeep that was parked in the driveway and could not retreat farther. He therefore pulled the gun out and fired a shot aimed at McCormick's knee as McCormick ran at him with the knife raised. McCormick continued toward Custer, despite having been shot in the thigh. As McCormick lunged at Custer with the knife, Custer jumped out of the way, raised the gun, and fired a shot as he twisted.

Custer testified that Leal began to scream at him and chase him; so he got back to the truck and returned to the apartment where he had been staying. He called Fields to tell him that

he had shot at McCormick, and Fields made arrangements
for Davis to pick up Custer and get him out of town. Custer
stayed at a motel in Big Springs, Nebraska, until some hours
later when police came to arrest him based on a tip from
Fields and Davis.

During the State's cross-examination of Custer, it asked
questions which pointed out that shortly after the shooting,
Leal and Wright gave statements to police consistent with
their testimony at trial, while Custer "had 15 months" and
"the opportunity to sit through all of the trial and listen to all
of the testimony" before he testified to his version of events.
The State also asked questions which pointed out that after
the shooting, Custer had made no attempt to report to the
police the shooting or McCormick's alleged aggressive actions.
Custer did not object to any of these questions.

Argument at the jury instruction conference shows that
Custer requested a "choice of evils" instruction with respect
to the charge of being a felon in possession of a firearm. He
argued that the instruction was appropriate because of his testi-
mony that he grabbed the gun he found in the back seat of the
truck only because he was concerned that he was being set up
when he arrived at Leal's house and that he needed to protect
himself. The court refused such an instruction after determin-
ing that such an instruction was not appropriate under the facts
of this case. Custer also objected to an instruction defining
premeditation because the instruction included a statement
to the effect that the "time needed for premeditation may be
so short as to be instantaneous," which statement was not
included in the statutory definition of premeditation. The court
overruled Custer's objection and gave the instruction. The
court also gave a self-defense instruction.

During closing arguments, the State pointed out that Custer
had not reported to police McCormick's alleged aggressive
actions with the knife. The State also suggested that Custer
had 15 months and knowledge of the testimony and evi-
dence against him before he gave his testimony regarding the

shooting. Custer did not object to the statements in the State's closing arguments, and he did not move for a mistrial based on the statements.

The jury found Custer guilty of first degree murder, use of a firearm to commit a felony, and being a felon in possession of a firearm. The court sentenced Custer to imprisonment for life for first degree murder, for 20 to 50 years for use of a firearm to commit a felony, and for 10 to 20 years for being a felon in possession of a firearm. The court ordered that the sentences be served consecutively to one another.

When imposing the sentence for first degree murder, the court orally stated at the sentencing hearing that the sentence was "a sentence of not less than a period of your natural life without the possibility of parole." However, the written sentencing order omitted the language regarding the possibility of parole.

In addition, at the sentencing hearing, the court orally stated in connection with both the sentence for use of a firearm to commit a felony and the sentence for being a felon in possession of a firearm that Custer would be given credit for 503 days he had previously served. The written order stated, in a paragraph separate from the paragraphs setting forth the sentences, that Custer "shall receive credit for five hundred three (503) days for time already served."

Custer appeals his convictions and sentences.

## ASSIGNMENTS OF ERROR

Custer claims that the district court erred when it refused a choice of evils instruction and when it gave an instruction defining premeditation that did not follow the statutory definition. He also claims that there was not sufficient evidence to sustain a conviction for first degree murder. He further claims that the State committed prosecutorial misconduct when it made certain remarks in closing arguments. Finally, with regard to sentencing, Custer claims that the district court erred when it orally pronounced sentence on the

murder conviction as life imprisonment "without the possibility of parole" and that the court imposed excessive sentences for the two other convictions.

In the State's brief, it asserts that the district court committed plain error in the manner it ordered the credit for time served to be applied.

## STANDARDS OF REVIEW

[1] To establish reversible error from a court's refusal to give a requested instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction is warranted by the evidence, and (3) the appellant was prejudiced by the court's refusal to give the tendered instruction. *State v. Planck*, 289 Neb. 510, 856 N.W.2d 112 (2014).

[2] Whether jury instructions are correct is a question of law, which an appellate court resolves independently of the lower court's decision. *State v. Stricklin*, 290 Neb. 542, 861 N.W.2d 367 (2015).

[3] In reviewing a claim that the evidence was insufficient to support a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the evidence admitted at trial, viewed and construed most favorably to the State, is sufficient to support the conviction. *State v. Davis*, 290 Neb. 826, 862 N.W.2d 731 (2015).

[4] When a defendant has not preserved a claim of prosecutorial misconduct for direct appeal, we will review the record only for plain error. *State v. Dubray*, 289 Neb. 208, 854 N.W.2d 584 (2014).

[5] An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court. *State v. Hunnel*, 290 Neb. 1039, 863 N.W.2d 442 (2015).

[6] Whether a defendant is entitled to credit for time served and in what amount are questions of law. *Id*. An appellate court reviews questions of law independently of the lower court. *Id*.

## ANALYSIS

*Discussion of Proposed Choice*
*of Evils Instruction.*

Custer first claims that the district court erred when it refused to instruct the jury regarding a choice of evils defense to the charge of being a felon in possession of a firearm. Custer failed to include his proposed instruction in the record on appeal, and we are not able to review the instruction on appeal. However, even if we favor Custer with various assumptions, a choice of evils instruction was not warranted by the evidence and we reject this assignment of error.

The record of the jury instruction conference shows that Custer objected to the court's proposed instruction setting forth the elements of being a felon in possession of a firearm and that his objection was based on the failure to include language regarding a choice of evils defense. The parties argued their respective positions regarding whether such language should be included, and the court determined that an instruction regarding choice of evils was not appropriate under the facts of this case.

[7] Although the court indicated at the jury instruction conference that a proposed instruction was on file, Custer did not include a proposed choice of evils instruction in the record on appeal. Custer needed to show that his tendered instruction was a correct statement of law and that it was warranted by the evidence. See *Planck, supra*. In order to do so, he needed to include his proposed instruction in the record on appeal. It is incumbent upon an appellant to supply a record which supports his or her appeal. *State v. Robinson*, 287 Neb. 799, 844 N.W.2d 312 (2014). Because Custer did not include the proposed instruction in the record on appeal, "we have no instruction

to review in order to determine whether it ought to have been given." See *id.* at 805, 844 N.W.2d at 318.

[8] Custer argues that although the proposed instruction is not included in the record, it is clear from the arguments of counsel at the jury instruction conference that Custer requested an instruction that followed the language of Neb. Rev. Stat. § 28-1407 (Reissue 2008). He asserts that the same language was proposed by the defendant in *State v. Mowell*, 267 Neb. 83, 672 N.W.2d 389 (2003). In *Mowell*, we stated that the defendant had presented an instruction which set forth the choice of evils defense provided by § 28-1407 and that the choice of evils defense

> requires that a defendant (1) acts to avoid a greater harm; (2) reasonably believes that the particular action is necessary to avoid a specific and immediate harm; and (3) reasonably believes that the selected action is the least harmful alternative to avoid the harm, either actual or reasonably believed by the defendant to be certain to occur.

267 Neb. at 94, 672 N.W.2d at 399. We did not decide in *Mowell* whether the instruction proposed by the defendant was a correct statement of law, and we further questioned whether a choice of evils justification was available as a defense to a charge of being a felon in possession of a firearm. Without deciding either issue, we assumed for the sake of argument that the proposed instruction was a correct statement of law and that the defense was generally available against a charge of being a felon in possession of a firearm. Having made such assumptions, we nevertheless concluded that under the facts of the case at hand, the defendant in *Mowell* was not entitled to an instruction on the choice of evils defense. If we were to make the same assumptions in this case, and if we were to assume that Custer's proposed instruction was based on the language of § 28-1407, similar to *Mowell*, we would again conclude that the evidence in this case did not entitle the defendant, Custer, to a choice of evils instruction.

In *Mowell*, we emphasized that the choice of evils defense requires that the defendant's actions are "'necessary to avoid a specific and immediately imminent harm'" and that "generalized and nonimmediate fears are inadequate grounds upon which to justify a violation of law." 267 Neb. at 96, 672 N.W.2d at 400. After reviewing the evidence in *Mowell*, we noted that "even if [the defendant] felt threatened and harassed by [the victim] to a point where he feared for his safety, [the defendant] had ample opportunity" to avoid the danger. 267 Neb. at 97, 672 N.W.2d at 401.

Custer argues that the facts of the present case are different from those in *Mowell*, because the threat in *Mowell* was vague and the defendant in *Mowell* possessed the firearm for a longer period of time. He contends that in this case, McCormick's threats against him "were far more repeated, direct, and unambiguous," brief for appellant at 23, and that he did not possess the firearm until he was faced with a specific and immediate harm.

Although the facts of this case differ from those in *Mowell*, the evidence in this case does not show that at the time Custer took possession of the firearm he faced a specific and immediately imminent harm. The evidence most favorable to Custer was his own testimony that when he arrived at Leal's house, he saw that McCormick was still there and that, fearing that he was being set up, he retrieved the gun from the back seat of the truck. At the time he retrieved the gun, Custer was still inside the truck and he had the opportunity to drive away; instead, he grabbed the gun, got out of the truck, and walked toward McCormick. Under Custer's version of events, he did not face a specific and immediately imminent harm until McCormick rushed at him with a knife, which did not occur until after Custer had already grabbed the gun, gotten out of the truck, and approached McCormick. That is, Custer possessed the firearm—the crime of which he was convicted—not to avoid a specific and immediate harm, but instead, before the harm developed. Therefore, even if we were to

assume Custer tendered a proposed instruction that followed the language of § 28-1407, and the defense was available to a charge of being a felon in possession of a firearm, we conclude that the district court did not err when it determined that a choice of evils instruction was not warranted by the evidence in this case.

*Jury Instruction Defining Premeditation*
*Was Not Improper.*

Custer next claims that the district court erred when it gave an instruction defining premeditation which included language that was not included in the statutory definition of premeditation. We conclude as a matter of law that the district court did not err when it gave the instruction.

The district court gave jury instruction No. 7 which instructed the jury on definitions of various terms relevant to the charges against Custer. The instruction included a definition of premeditation based on NJI2d Crim. 4.0. The court instructed: "<u>Premeditation</u> means to form the intent to do something before it is done. The time needed for premeditation may be so short as to be instantaneous provided that the intent to act is formed before the act and not simultaneously with the act." Custer objected to the second sentence of the definition for premeditation because it did not conform to the statutory definition of premeditation under Neb. Rev. Stat. § 28-302 (Reissue 2008). The definition of premeditation in jury instruction No. 7 is nearly identical to the definition provided in NJI2d Crim. 4.0. In comparison to instruction No. 7, § 28-302(3) provides one sentence, i.e.: "Premeditation shall mean a design formed to do something before it is done," but does not contain a second sentence regarding the time needed for premeditation.

[9] The argument made by Custer regarding the variance between the statutory definition in § 28-302(3) and instruction No. 7 was rejected by this court in *State v. Taylor*, 282 Neb. 297, 803 N.W.2d 746 (2011). In *Taylor*, we noted that

the second sentence of NJI2d Crim. 4.0 had "apparently been added to further specify the meaning of 'before' as it was used in § 28-302(3)." 282 Neb. at 310, 803 N.W.2d at 758. We reviewed our precedent to the effect that no particular length of time for premeditation is required, provided that the intent to kill is formed before the act is committed and not simultaneously with the act that caused the death, as well as other precedent to the effect that the duration of time required to establish premeditation may be so short that it is instantaneous. *Id*.

Custer argues that the instruction was erroneous because "these two words ['instantaneous' and 'simultaneous'] are synonyms that mean something occurring in the same moment." Brief for appellant at 30. He contends that instructing the jury that premeditation may be "instantaneous" violates the statutory requirement that intent must be formed before the act is done. We disagree.

"Instantaneous" is defined as "done, occurring, or acting without any perceptible duration of time," Webster's Third New International Dictionary of the English Language, Unabridged 1171 (1993), whereas "simultaneous" is defined as "existing or occurring at the same time," *id.* at 2122. The two words are not synonymous; "instantaneous" refers to the passage of time during which something occurs, while "simultaneous" refers to the point in time at which two or more things occur. Thus, premeditation may occur instantaneously, or in an amount of time of imperceptible duration, but without occurring simultaneously with, or at the same point in time as, the act. The instruction makes it clear that although premeditation may be instantaneous, it must nevertheless occur before the act and not simultaneous with it. The instruction therefore does not contradict the statutory requirement that premeditation must occur before the act. The instruction instead explains that, while premeditation must occur before the act and not simultaneous with it, premeditation need not occur for any minimal duration of time and may occur in an instant, that is, may be

instantaneous. Custer also argues that the instruction is a violation of the separation of powers because it adds to the definition of premeditation provided by the Legislature. However, a court's proper role is to interpret statutes and clarify their meaning. See *Taylor, supra*. The instruction given in this case interprets and clarifies the statutory definition; it does not change or contradict the statutory definition.

Similar to our discussion in *Taylor, supra*, we conclude that jury instruction No. 7 in this case conformed to our interpretation of premeditation as it is used in § 28-302(3). Accordingly, as a matter of law, the district court did not err when it gave the definition of premeditation in instruction No. 7, and we reject this assignment of error.

*The Evidence Was Sufficient to Support Custer's*
*Conviction for First Degree Murder.*

Custer claims that there was not sufficient evidence to sustain a conviction for first degree murder because the evidence did not show that he killed McCormick with deliberate and premeditated malice. The theory of Custer's defense was essentially that he killed McCormick in self-defense. The State contends that its evidence established that Custer committed first degree murder, that there was no sudden quarrel, and that Custer did not kill McCormick in self-defense. We conclude that there was sufficient evidence from which the jury could have found that Custer committed first degree murder.

As an initial matter, we note that Custer's claim of insufficient evidence of deliberate and premeditated malice relies in part on his argument, which we rejected above, that premeditation cannot be "instantaneous" because instantaneous premeditation is synonymous with intent formed simultaneously with the act. To the extent Custer's argument is that there was not sufficient evidence of premeditation because the State proved only instantaneous premeditation, we reject such argument, because instantaneous premeditation is sufficient.

Custer's main argument is that there was insufficient evidence of first degree murder, because there was evidence that

he did not come to Leal's house planning to kill McCormick, that he instead came to settle the dispute over the money he owed to McCormick, that he grabbed the gun from the back seat of the truck only after he became concerned that he was being set up, and that he did not shoot McCormick until McCormick lunged at him with a knife. Custer contends that this evidence shows that the killing was not done with deliberate and premeditated malice and that instead, it was done upon a sudden quarrel and in self-defense.

Although there was evidence in support of the version of events as urged by Custer, the State presented evidence which contradicted Custer's version of how the incident occurred and from which the jury could have found that Custer killed McCormick with deliberate and premeditated malice and that the killing did not result from a sudden quarrel and was not justified as self-defense. The State's evidence included the testimony by Leal and by Wright which indicated that Custer got out of the truck armed with a gun, left the engine running, walked toward McCormick, and shot him twice within seconds—all before a sudden quarrel developed or self-defense was justified.

The main evidence supporting Custer's version of events was his testimony in his own defense. But he also directs our attention to physical evidence, including evidence regarding the trajectory of the gunshots, which he asserts supports his version of events over the version of events recounted by other witnesses. Thus, in this trial, there was conflicting testimony regarding the events surrounding the shooting, and there was other evidence which the jury may have found relevant to its determination of the accuracy or credibility of the witnesses' testimony. As the finder of fact, the jury resolved the tension and conflicts in the evidence.

In reviewing a claim that the evidence was insufficient to support a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the

finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the evidence admitted at trial, viewed and construed most favorably to the State, is sufficient to support the conviction. *State v. Davis*, 290 Neb. 826, 862 N.W.2d 731 (2015).

Viewing the evidence in the light most favorable to the State, we conclude that the evidence was sufficient to support Custer's conviction for first degree murder. We therefore reject this assignment of error.

*Prosecutor's Comments During Closing*
*Arguments Were Not Improper.*

Custer next claims that the State committed prosecutorial misconduct when it made certain statements during closing arguments. Custer takes issue with the State's comments regarding the amount of time he had to prepare his testimony for trial and the State's comments highlighting his failure to report the shooting and McCormick's alleged aggressive actions to the police. He contends that the statements were improper comments on the exercise of his right to remain silent. We conclude that the State's comments during closing arguments were not improper and did not constitute prosecutorial misconduct.

[10,11] We note that Custer did not object when the State questioned him about these issues on cross-examination or when the State remarked on these issues during closing arguments; the claim on appeal is limited to the prosecutor's comments made during closing arguments. When a party has knowledge during trial of irregularity or misconduct, the party must timely assert his or her right to a mistrial. *State v. Stricklin*, 290 Neb. 542, 861 N.W.2d 367 (2015). A party who fails to make a timely motion for mistrial based on prosecutorial misconduct waives the right to assert on appeal that the court erred in not declaring a mistrial due to such prosecutorial misconduct. *Id.*

Although Custer acknowledges that he failed to object to the alleged prosecutorial misconduct at trial, he argues that

we should note the alleged misconduct as plain error. When a defendant has not preserved a claim of prosecutorial misconduct for direct appeal, we will review the record only for plain error. *State v. Dubray*, 289 Neb. 208, 854 N.W.2d 584 (2014). We apply the plain error exception to the contemporaneous-objection rule sparingly. *State v. Alarcon-Chavez*, 284 Neb. 322, 821 N.W.2d 359 (2012). Therefore, in this case, we will review the record for plain error with regard to Custer's allegations of prosecutorial misconduct.

[12] An appellate court may find plain error on appeal when an error unasserted or uncomplained of at trial, but plainly evident from the record, prejudicially affects a litigant's substantial right and, if uncorrected, would result in damage to the integrity, reputation, and fairness of the judicial process. *Id*. Generally, we will find plain error only when a miscarriage of justice would otherwise occur. *Id*.

[13,14] Prosecutorial misconduct encompasses conduct that violates legal or ethical standards for various contexts because the conduct will or may undermine a defendant's right to a fair trial. *Dubray, supra*. In assessing allegations of prosecutorial misconduct in closing arguments, a court first determines whether the prosecutor's remarks were improper. It is then necessary to determine the extent to which the improper remarks had a prejudicial effect on the defendant's right to a fair trial. *State v. Watt*, 285 Neb. 647, 832 N.W.2d 459 (2013). The first step in our analysis, then, is to determine whether the State's comments to the jury regarding the amount of time Custer had to consider his testimony and Custer's failure to report the incident were improper.

[15,16] With regard to whether remarks made during closing arguments are improper, we have stated that prosecutors are charged with the duty to conduct criminal trials in such a manner that the accused may have a fair and impartial trial, and prosecutors are not to inflame the prejudices or excite the passions of the jury against the accused. *Id*. A prosecutor's conduct that does not mislead and unduly influence the jury does not constitute misconduct. *Id*.

Custer asserts that it was improper for the State to note that Custer did not report to police his allegations that McCormick had threatened him with a knife, which allegations form the basis for his claim of self-defense. The State further noted that Custer had 15 months and the advantage of hearing other witnesses' testimony in order to prepare his testimony in his own defense. The State contrasted this with the trial testimony of Leal and Wright, which was consistent with statements they gave to police within hours after the incident.

[17] Custer argues that these comments by the prosecutor violated a line of cases beginning with *Doyle v. Ohio*, 426 U.S. 610, 611, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976), in which the U.S. Supreme Court held that the State may not "seek to impeach a defendant's exculpatory story, told for the first time at trial, by cross-examining the defendant about his failure to have told the story after receiving *Miranda* warnings at the time of his arrest." In *Fletcher v. Weir*, 455 U.S. 603, 607, 102 S. Ct. 1309, 71 L. Ed. 2d 490 (1982), the U.S. Supreme Court clarified that the *Doyle* rule did not necessarily apply to a prosecutor's remarks about a postarrest silence occurring before *Miranda* warnings and stated:

> In the absence of the sort of affirmative assurances embodied in the *Miranda* warnings [to the effect that his silence will not be used against him or her], we do not believe that it violates due process of law for a State to permit cross-examination as to [pre-*Miranda*] postarrest silence when a defendant chooses to take the stand.

Similar to *Fletcher, supra*, in Nebraska, we have stated that "it is not a violation of fundamental fairness for the State to use a defendant's pre-*Miranda* silence as impeachment or as substantive evidence of sanity." *State v. Harms*, 263 Neb. 814, 824-25, 643 N.W.2d 359, 371 (2002). We have explicitly extended the protection of *Doyle* to a prosecutor's comments on the defendant's silence made in closing argument. See *State v. Lopez*, 274 Neb. 756, 743 N.W.2d 351 (2008). The *Doyle* challenge in the instant case is to the prosecutor's remarks during closing argument.

Custer directs our attention to *State v. Lofquest*, 227 Neb. 567, 418 N.W.2d 595 (1988). In *Lofquest*, we noted that the State's remarks, some of which were made during the prosecutor's closing, referred to the defendant's failure to tell his story to police at any time prior to the trial. We stated in *Lofquest* that the dispositive factor with respect to a prosecutor's remarks regarding a defendant's silence is the period of silence to which the prosecutor referred—that is, whether it is the period before or the period after the defendant received *Miranda* warnings. We determined that the prosecutor's "generalized questions and comments [made] it nearly impossible to discern, for purposes of a *Doyle* inquiry, what period of silence the prosecution was referring to, pre-*Miranda* or post-*Miranda*" and that "the prosecutor's remarks could be construed as referring to [the defendant's] silence from the first police contact through the moment before [the defendant] told his story at trial." 227 Neb. at 570, 418 N.W.2d at 597. We concluded that the prosecutor's remarks in *Lofquest* were improper because "[w]e cannot allow prosecutors to sidestep the *Doyle* protections by skirting the edge of the law with vague and imprecise references to a defendant's silence." 227 Neb. at 570, 418 N.W.2d at 597.

Custer argues that, similar to *Lofquest*, the State's remarks made during closing argument in this case encompassed the entire period until he testified at trial and that the remarks were therefore improper. However, we note that the remarks in which the State referred specifically to Custer's silence clearly pertained to a time before his arrest and before *Miranda* warnings were given. During closing arguments, the State discussed Custer's actions immediately after the shooting and stated that he did not call police. The State remarked, "He even sees the police car drive by and never bothers to tell anybody that he was just in this life and death struggle. Never tells the police about that." These remarks clearly refer to Custer's silence at a time before he was arrested and given *Miranda* warnings. They were unlike the remarks we found improper in *Lofquest, supra*, in which the State imprecisely

referred to the defendant's silence prior to trial, which period might have included times after the defendant received post-*Miranda* warnings.

Custer argues that in addition to the remarks discussed above specifically referring to Custer's failure to report the incident to police, the State's remarks regarding the amount of time he had to prepare his testimony prior to trial were effectively improper comments on his silence. He argues that the time period before trial necessarily includes some time after his arrest and after he invoked his rights. He notes that in closing arguments, the State remarked that "Custer wrapped his story around the forensics after having 15 months to look at it by hearing the testimony about seeing—here's the angle here and know that [McCormick] go [sic] wounded right here," and later repeated that "Custer forms his story around the forensics."

We do not read these remarks as commenting on Custer's silence after his arrest and after invocation of his right to remain silent. Instead, the remarks are similar to those in *State v. Jacob*, 253 Neb. 950, 974, 574 N.W.2d 117, 137 (1998), *abrogated on other grounds, State v. Nolan*, 283 Neb. 50, 574 N.W.2d 117 (2012), in which the prosecutor stated during closing arguments that before the defendant testified at trial, he "'had five years to think of his answers, five years to run through all of this. Five years to prepare'" and that he had "'sat through this trial and heard every witness and every question.'" We characterized the State's remarks in *Jacob* as commenting on the defendant's credibility and as implying that "in evaluating the credibility of [the defendant's] testimony, the jury should consider that [the defendant] had the benefit of first hearing all the witnesses' testimony and had 5 years to prepare his testimony." *Id*. at 975-76, 574 N.W.2d at 138. We stated that we found "nothing in the argument that can be construed as a comment on [the defendant's] silence." *Id*. at 976, 574 N.W.2d at 138. Similar to the remarks in *Jacob*, the remarks by the State in closing argument in this case were directed to

the credibility of Custer's testimony rather than remarks on Custer's silence.

We conclude that the State's remarks during closing arguments were not improper, and we therefore need not consider whether the comments prejudiced Custer's right to a fair trial. Because there was no prosecutorial misconduct and no plain error, we reject Custer's assignment of error.

*District Court Properly Modified Custer's
Sentence of Life Imprisonment by Removing
Erroneous Language Regarding Parole
in the Valid Written Order.*

Custer claims that the district court erred when, at the sentencing hearing, it orally sentenced him on the first degree murder conviction to life imprisonment "without the possibility of parole." Because we conclude that the district court properly modified the invalid oral sentence by entering a valid written order that removed the erroneous language of "without the possibility of parole," there is no merit to this assignment of error.

When imposing the sentence for first degree murder, the court stated at the sentencing hearing that the sentence was "a sentence of not less than a period of your natural life without the possibility of parole." However, the subsequent written sentencing order omitted the language regarding the possibility of parole.

[18] Custer was convicted of first degree murder, a Class IA felony. Under Neb. Rev. Stat. § 28-105 (Cum. Supp. 2014), a Class IA felony is punishable by life imprisonment, but the statute does not authorize a sentence of life imprisonment without the possibility of parole. Therefore, a sentence of life imprisonment "without the possibility of parole" is erroneous, but not void. See *State v. Conover*, 270 Neb. 446, 703 N.W.2d 898 (2005). Custer urges us to remand the cause for resentencing. Although the State does not dispute that a sentence of life imprisonment without the possibility of parole is erroneous, it argues that in this case, the written sentencing order,

which does not contain the "without the possibility of parole" language, is controlling over the earlier sentence orally pronounced and that there is no need to remand the cause for resentencing. We agree with the State.

[19,20] We have held that a sentence validly imposed takes effect from the time it is pronounced. *State v. Clark*, 278 Neb. 557, 772 N.W.2d 559 (2009). And when a valid sentence has been put into execution, the trial court cannot modify, amend, or revise it in any way, either during or after the term or session of court at which the sentence was imposed. *Id.* As a result, we have held that when there is a conflict between the record of a judgment and the verbatim record of the proceedings in open court, the verbatim record of the earlier proceedings in open court prevails. See *State v. Salyers*, 239 Neb. 1002, 480 N.W.2d 173 (1992). These holdings presume an initial sentence was validly imposed.

[21] In this case, the sentence pronounced at the sentencing hearing was erroneous to the extent the court stated that imprisonment would be without the possibility of parole. See *Conover, supra*. We have held that where a portion of a sentence is valid and a portion is invalid or erroneous, the court has authority to modify or revise the sentence by removing the invalid or erroneous portion of the sentence if the remaining portion of the sentence constitutes a complete valid sentence. *State v. McDermott*, 200 Neb. 337, 263 N.W.2d 482 (1978). We therefore determine that the district court had authority to modify the sentence to remove the erroneous language, and the relief sought in this assignment of error has been accorded to Custer.

*Sentences Imposed by District Court for Custer's
Convictions for Use of a Firearm to Commit a
Felony and Being a Felon in Possession of a
Firearm Were Not an Abuse of Discretion.*

Custer further claims that the district court imposed excessive sentences on the convictions for use of a firearm to commit a felony and being a felon in possession of a firearm.

We find no abuse of discretion in the sentences imposed for these convictions.

In addition to the sentence of life imprisonment it imposed for first degree murder, the district court sentenced Custer to imprisonment for 20 to 50 years for use of a firearm to commit a felony and for 10 to 20 years for being a felon in possession of a firearm. The court ordered all sentences to be served consecutively. Life imprisonment was the only sentence available for the first degree murder conviction; therefore, Custer's excessive sentence arguments focus on the sentences for use of a firearm to commit a felony and being a felon in possession of a firearm.

Custer's conviction for being a felon in possession of a firearm, first offense, is a Class ID felony under Neb. Rev. Stat. § 28-1206(3)(b) (Cum. Supp. 2014). A Class ID felony is punishable by imprisonment for a mandatory minimum of 3 years and a maximum of 50 years under § 28-105. Use of a firearm to commit a felony is a Class IC felony under Neb. Rev. Stat. § 28-1205(1)(c) (Cum. Supp. 2014). A Class IC felony is punishable by imprisonment for a mandatory minimum of 5 years and a maximum of 50 years under § 28-105. And the sentence for use of a firearm to commit a felony must be consecutive to any other sentence imposed under § 28-1205(3). The sentences imposed by the district court were therefore within statutory limits.

[22,23] An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court. *State v. Hunnel*, 290 Neb. 1039, 863 N.W.2d 442 (2015). When imposing a sentence, a sentencing judge should consider the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense, and (8) the violence involved in the commission of the crime. *Id*. The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing

judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life. *Id*.

Custer notes that although § 28-1205(3) requires that the sentence for use of a firearm to commit a felony must be consecutive to any other sentence imposed, there is no similar requirement with respect to the sentence for being a felon in possession of a firearm under § 28-1206. He therefore urges that the sentence for being a felon in possession of a firearm should have been ordered to be served concurrently to the sentence for first degree murder. He also contends that a lesser term of years was appropriate for the sentence for use of a firearm to commit a felony. He asserts that mitigating factors include the lack of a significant history of violent crime, the role his addiction to methamphetamine played in contributing to this and his prior offenses, his remorse for this offense, and his subjective belief that he acted in self-defense.

With regard to Custer's criminal history, although it may not include numerous violent offenses, it dates back to 1999 and includes several serious offenses, including burglary, theft, and assault. Custer also showed a history of substance abuse and a high risk to reoffend.

The record of the sentencing hearing shows that the court considered the appropriate factors in determining Custer's sentences, and the record does not show that the court considered improper factors. With regard to Custer's argument that he acted in self-defense, the district court noted that "[t]here were any number of points in the time that this lead [sic] to the event of the night that . . . McCormick was killed where any number of people, including yourself could have stopped it, any of you could have stopped it and you didn't." The court particularly questioned why Custer got out of the truck after he suspected he may have been set up.

Having reviewed the record, we cannot say that the sentences imposed by the district court were an abuse of discretion. We reject this assignment of error.

*Sentencing Order Is Modified to Reflect
Proper Credit for Time Served.*

Finally, the State contends that the court committed plain error in the manner in which it ordered time served to be credited. The State asserts that the court ordered the time to be credited against all three of Custer's sentences. We agree that there was plain error in the crediting of time served, and we therefore modify the sentencing order to reflect the proper crediting of time served.

At Custer's sentencing hearing, the district court stated in connection with both the sentence for use of a firearm to commit a felony and the sentence for being a felon in possession of a firearm that Custer would be given credit for 503 days he had previously served. The written order stated in a paragraph separate from the paragraphs imposing sentences that Custer "shall receive credit for five hundred three (503) days for time already served." The State argues that the sentencing order indicates that time is to be credited against all the sentences, including the sentence for first degree murder.

[24,25] When a defendant is sentenced to life imprisonment for first degree murder, the defendant is not entitled to credit for time served in custodial detention pending trial and sentence; however, when the defendant receives a sentence consecutive to the life sentence that has maximum and minimum terms, the defendant is entitled to receive credit for time served against the consecutive sentence. *State v. Ely*, 287 Neb. 147, 841 N.W.2d 216 (2014). A sentencing judge must separately determine, state, and grant the amount of credit on the defendant's sentence to which the defendant is entitled. *Id.*

[26] Although under Neb. Rev. Stat. § 83-1,106 (Reissue 2014), an offender shall be given credit for time served as a result of the charges that led to the sentences, presentence credit is applied only once. Therefore, when consecutive sentences are imposed for two or more offenses, periods of presentence incarceration may be credited only against the

aggregate of all terms imposed. *State v. Williams*, 282 Neb. 182, 802 N.W.2d 421 (2011).

In this case, the court's oral pronouncement of sentence appeared to apply the full credit to each of the sentences for use of a firearm to commit a felony and for being a felon in possession of a firearm; the written sentencing order was unclear with regard to how the credit should be applied. We therefore modify the sentencing order to state that Custer is entitled to credit for time served in the amount of 503 days for time already served against the aggregate of the minimum and the aggregate of the maximum sentences of imprisonment for use of a firearm to commit a felony and for being a felon in possession of a firearm. See *Williams, supra*.

## CONCLUSION

Having rejected Custer's assignments of error, we affirm Custer's convictions. We affirm Custer's sentences as modified to correct plain error in the application of the credit for time served. The sentencing order shall be modified to state that Custer is entitled to credit for time served in the amount of 503 days for time already served against the aggregate of the minimum and the aggregate of the maximum sentences of imprisonment for use of a firearm to commit a felony and for being a felon in possession of a firearm.

AFFIRMED AS MODIFIED.