IN THE NEBRASKA COURT OF APPEALS

MEMORANDUM OPINION AND JUDGMENT ON APPEAL
(Memorandum Web Opinion)

STATE V. LOYD

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

DONTEVOUS D. LOYD, APPELLANT.

Filed December 6, 2016.    No. A-16-521.

Appeal from the District Court for Douglas County: GREGORY M. SCHATZ, Judge. Affirmed.

Thomas C. Riley, Douglas County Public Defender, Natalie M. Andrews, and Cindy A. Tate for appellant.

Douglas J. Peterson, Attorney General, and George R. Love for appellee.

MOORE, Chief Judge, and RIEDMANN and BISHOP, Judges.

BISHOP, Judge.

INTRODUCTION

A Douglas County District Court jury found Dontevous D. Loyd guilty of burglary, a Class III felony at the time of Loyd's offense. The district court sentenced Loyd to no less than 14 nor more than 18 years' imprisonment. Loyd appeals the sufficiency of the evidence and the sentence imposed. We affirm.

BACKGROUND

Following jury selection, trial commenced March 15, 2016, and finished the following day. The testimony of witnesses and other evidence received revealed the following.

On March 31, 2015, Officers Scott Zymball, Jaime Desautels, and Nathan Buresh, all from the Omaha Police Department, responded to a dispatch received at 4:39 a.m. regarding a burglary

- 1 -

in progress at a residence on Crown Point Avenue in Omaha, Nebraska. Zymball and Buresh were together in one vehicle, and Desautels in another; both vehicles arrived simultaneously at about 4:41 a.m. without lights and sirens activated to avoid alerting any suspects. The officers took up positions around the house. While outside the house, Zymball heard noises from within the house and saw a man, later identified as Loyd, exit through the front door. Zymball ordered Loyd to lay on the ground and Loyd complied. Zymball handcuffed Loyd, and a pat-down revealed no weapons.

While Zymball and Buresh secured Loyd, Desautels saw another person, later identified as Eljuan Daniel, attempt to leave the house from a back door. Desautels described two back doors on this ranch level home, one at the top of some stairs which led to the main level of the home, the other that led to a walkout basement. Daniel was exiting the door at the main level of the home. Desautels told Daniel to stop, but Daniel fled back inside the house. Desautels radioed that there was at least one suspect in the house and requested assistance. When Desautels heard there was a party in custody at the front of the house, he returned to the front and saw that the party in custody was not the same male he saw flee back inside the house.

Officer Brian Dembinski arrived while Loyd was being removed from the front of the residence; he was told another person might be inside. Loyd began having respiratory distress, so an ambulance was requested to transport Loyd to a hospital for treatment. (Buresh drove behind the ambulance and once Loyd was medically cleared, Buresh assisted in transporting Loyd to jail.) Dembinski went to the backyard to make sure no one escaped out the back. Dembinski saw that a back door had been kicked in, and he could hear somebody running up some stairs inside the house and then to the far side of the house. Numerous officers arrived at the scene and a request was also made for a canine to assist with a search.

When a Douglas County canine officer arrived at the scene, commands were made for anyone inside to "sound off" or the dog would be released into the residence. After the dog barked for a little while, Daniel announced he was coming out, and he surrendered himself into custody.

Officers then swept the house for additional people and inspected for damage and evidence of a crime. According to Dembinski, the back door appeared to have been forced open; the hinges of the door had been removed from the wooden door frame and the dead bolt was still locked and exposed. The door was propped open, "but it wasn't propped open on the door handle side, it was the hinges pushed in." Dembinski described these details while reviewing photos of the door taken at the scene, which were received into evidence. Dembinski said the basement entry door was secure and he described it as having a bracket system and being "extremely fortified to where you couldn't get into it."

While looking through the house, the officers found copper pipes piled in the bottom-half of a shop vacuum in the basement. Desautels testified that his report indicated there were approximately 7 pieces of pipe in the shop vac container. The copper pipes had not been cut with a saw or cutting tool because the ends were bent and not circular at the edges. Zymball testified that "the pieces seem[ed] to be damaged by being bent and folded, not by being cut." To clarify a description in his report stating the pipes were bent and cut, Desautels testified that the "pipe looked like it was bent over and over again to the point where it just breaks off . . . if you take, like, copper pipe, you bend it, re-bend it, bend it, re-bend it, it eventually crimps and breaks."

Zymball observed what appeared to be pipes broken off of the hot water heater and the furnace, and some water on the floor; he discussed photographs received into evidence which were taken of the basement area, particularly around the furnace and hot water heater. Zymball acknowledged that the report about the incident drafted by Buresh did not say anything about there being water on the floor in the basement. However, Dembinski also testified about seeing numerous pieces of copper pipe in the shop vac bucket and that there was a very small amount of water leaking from somewhere on the floor. Dembinski described the piping as "kind of old" and "bent and kind of damaged, like it's been pulled . . . like somebody was trying to bend it to pull it from something." The officers found no hacksaws or other cutting tools, nor did they find any other equipment that could have been used to force open the back door of the house. Finally, the officers found no signs of squatters or trespassers living in the house, no food, perishables, or bedding. No vehicles were located nearby that belonged to either Loyd or Daniel.

Maggie Horan, a crime lab technician with the Omaha Police Department, testified that upon her arrival to the scene of this incident, she first met with Dembinski, Desautels, and a Sergeant Christensen, and she was told that suspects had been caught inside the house. Horan then photographed the scene but did not dust for fingerprints or swab for DNA because when suspects are arrested inside a house or are seen running from a house, as in this case, she does not normally process for fingerprints or swab for DNA. On cross-examination, Horan acknowledged that the door to the house could have been broken days before it was ever called in to the police and that the tub of pipes could have been sitting for days prior to Loyd ever entering the property.

During the investigation, William Mora, the owner of the house, was contacted by a 911 operator about the incident and told his presence was needed at the scene. Mora renovates homes in the north Omaha area and rents them out. Mora had owned the subject property since 2008 and was remodeling to expand an entranceway and to move the laundry room from an existing bathroom to the furnace and water heater area. Mora was last at the house about five days prior when he had dropped off flooring tiles for the bathroom still being remodeled. He had already had the water connections for the washer and dryer moved to the furnace area where they were reconnected and installed; this plumbing work had been done in February at a cost of about $500. After being called to the residence, Mora observed in the basement that all the plumbing work that had been done with the washer and dryer hookups had been completely removed, all the pipes to the water heater had been removed, and the copper lines to the furnace appeared to be damaged.

Also, when Mora left the house five days prior, he had locked the doors and windows and left the water shutoff valve in the "on" position. After the break in, the water shutoff valve was in the "off" position. Mora also observed that the drop ceiling tiles in the basement had been removed; he said that electrical lines run along the floor joists above, as well as water lines, and they were secured against the floor joists. Mora saw the shop vac with the copper, and noticed copper had been removed from around the water heater, the furnace, and the new laundry hookups. There was also damage to piping to an air conditioning unit in the basement. Mora stated that the piping was not extra construction material left lying around the basement. Mora confirmed that no one was renting the house at the time of the incident, that no one had been given permission to be in the house at that time, and that no one had been given permission to remove the copper piping from

the house. Mora's repair costs totaled $1,200; this included replacing the piping to the water heater, furnace, and air conditioner, the hookups for the washer, and the damaged back door and frame.

On March 16, 2016, the jury returned a verdict finding Loyd guilty of burglary. On May 10, the district court sentenced Loyd to no less than 14 nor more than 18 years' imprisonment, with credit for 25 days served. Loyd appeals.

## ASSIGNMENTS OF ERROR

Restated, Loyd assigns as error: (1) the evidence is insufficient to support his conviction for burglary and (2) his sentence is excessive.

## STANDARD OF REVIEW

In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. The relevant question when an appellate court reviews a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Jones*, 293 Neb. 452, 878 N.W.2d 379 (2016).

An appellate court reviews criminal sentences for an abuse of discretion, which occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Id.*

## ANALYSIS

### SUFFICIENCY OF EVIDENCE

Loyd first assigns as error that the evidence presented at trial was insufficient to support his conviction. He argues that the homeowner, Mora, had not been at his property for five days, so "there were five entire days unaccounted for[,]" and no evidence that anyone checked on the residence "during this broad timeframe to discern when the damage to the back door occurred and who was responsible." Brief for appellant at 10. Loyd suggests the damage could have been done hours or days prior to the dispatch, and that Loyd and Daniel "could have simply walked through an open door, which had previously been forced open during this broad time frame of five days." *Id*. at 11. Loyd is also critical of the crime lab technician who decided against testing for fingerprints or swabbing for DNA, and claims that photographs taken at the scene do not depict any small amounts of water (presumably contradicting testimony that there was water on the floor in the basement).

Loyd also challenges law enforcement's failure to examine the hands of Loyd or Daniel in light of their testimony that the piping had been repeatedly bent until it could be removed. "This is troubling in light of the fact that law enforcement discovered on the night in dispute that there were no cutting tools or weapons within the house on either [Loyd] or [Daniel.]" Brief for appellant at 11. Loyd argues there was no evidence to prove Loyd intended to steal property; instead, the evidence showed neither Loyd nor Daniel had any tools on them, no pipe cutting tools were found in the house, no vehicle belonging to Loyd or Daniel was located near the scene, and no backpack

or bag to conceal items was in either man's possession. Loyd claims it is implausible for a jury to convict based on the theory "that these two men were going to walk down the street at nearly five in the morning - a time at which many individuals awake for the day - with a yellow shop vacuum container without any vehicle to load it in just so they could have a bit of copper piping." *Id*. at 12.

Finally, Loyd argues that even if there was adequate evidence to prove Loyd was at the property when the breaking and entering occurred, and that Daniel had an intent to steal property, the State failed to prove that Loyd "was anything more than merely present at the scene of the crime." *Id*. In support of this argument, Loyd says there were no tools or weapons on his person, his hands were not examined, his fingerprints and DNA were not found on the backdoor or on the piping, and he did not have a bag or "'getaway'" vehicle near the residence. *Id*. at 13.

Loyd was convicted of burglary. Neb. Rev. Stat. § 28-507 (Reissue 2008) states, in relevant part:

(1) A person commits burglary if such person willfully, maliciously, and forcibly breaks and enters any real estate or any improvements erected thereon with intent to commit any felony or with intent to steal property of any value.

As set forth previously, when reviewing sufficiency of the evidence claims, we do not resolve conflicts in the evidence, pass on credibility of witnesses, or reweigh the evidence; and after viewing the evidence in the light most favorable to the prosecution, we consider whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See *State v. Jones, supra*.

In this case, the evidence established that in the early morning hours of March 31, 2015, police officers found Loyd exiting an unoccupied home that was not his own, and the back door to the home had been unhinged and forcibly entered. Copper pipes had been forcibly removed from their fixtures within the basement, without the aid of a cutting tool, and piled into the bottom container of a shop vacuum. A jury could reasonably conclude forcible entry and an intent to remove this property from the home. The owner of the house was in the midst of remodeling the home, the home was not being rented by anyone, and there were no signs to indicate anyone had been living in the home. No one had permission to be in the home at the time of the incident, and when the owner had last been at the residence five days earlier, the doors and windows had been secured upon his departure.

When police arrived at the scene, they saw Loyd attempt to leave the house through the front door. Trying to leave an unoccupied house as soon as law enforcement arrives, combined with the other evidence in this case, allowed an inference that Loyd acted with consciousness of guilt. When the evidence is sufficient to justify an inference that the defendant acted with consciousness of guilt, the fact finder can consider such evidence even if the conduct could be explained in another way. *State v. Oldson*, 293 Neb. 718, 884 N.W.2d 10 (2016). See, also, *State v. Jacob*, 253 Neb. 950, 574 N.W.2d 117 (1998), *overruled in part on other grounds, State v. Nolan*, 283 Neb. 50, 807 N.W.2d 520 (2012) (to aid in determining innocence or guilt of defendant, jury may consider defendant's voluntary flight immediately or soon after the occurrence of a crime); *State v. Lincoln*, 183 Neb. 770, 164 N.W.2d 470 (1969) (for departure to take on legal significance of flight, there must be circumstances present and unexplained which, in conjunction with the leaving, reasonably justify an inference that it was done with a consciousness of guilt and

pursuant to an effort to avoid apprehension or prosecution based on that guilt). See, also, *State v. Draganescu*, 276 Neb. 448, 755 N.W.2d 57 (2008) (defendant argued evidence insufficient because only direct evidence linking him to marijuana was his presence in the van; totality of the circumstantial evidence supported jury's finding defendant jointly possessed marijuana with driver of van).

At trial, Loyd's attorneys questioned witnesses about the five days between Mora's last visit to the house and the morning Loyd was arrested, clearly attempting to establish reasonable doubt by suggesting the possibility that someone else may have been in the home during that time who could have removed the piping. For example, on cross-examination, the crime lab technician acknowledged that the door to the house could have been broken days before it was ever called in to the police and that the tub of pipes could have been sitting for days prior to Loyd ever entering the property. Additionally, the officers who testified were asked whether cutting tools or weapons were found in the men's possession or in the house, and whether any vehicle was located nearby; again, a suggestion that the absence of these items should cast reasonable doubt on Loyd's culpability. The jury apparently chose to place greater weight on other evidence presented. That evidence included, for example, Loyd and Daniel being caught exiting the house in the early morning hours, and testimony and photographs establishing forcible entry through a back door of the house. There were also photographs of the house and the removed piping, and the officers' and Mora's testimony about how the pipes had been removed without the use of cutting tools. Viewed in the light most favorable to the State, the evidence here is sufficient for any rational trier of fact to have found the essential elements of burglary beyond a reasonable doubt.

EXCESSIVE SENTENCE

Loyd's remaining assigned error asserts that the district court abused its discretion because it did not seriously consider the mitigating factors for sentencing set out in *State v. Timmens*, 263 Neb. 622, 641 N.W.2d 383 (2002). Loyd, age 24 at sentencing, argues that his sentence should be different because of his age, the shorter sentence of Daniel, and the district court's improper consideration of Loyd's additional arrests and disciplinary actions while in custody.

In imposing a sentence, a judge should consider the defendant's age, mentality, education, experience, and social and cultural background, as well as his or her past criminal record or law-abiding conduct, motivation for the offense, nature of the offense, and the amount of violence involved in the commission of the crime. *Timmens, supra*. The sentencing court is not limited in its discretion to any mathematically applied set of factors. *Id.* The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observations of the defendant's demeanor and attitude and all of the facts and circumstances surrounding the defendant's life. *Id.*

On advice of counsel, Loyd did not participate in the presentence investigation (PSI) because he had other felony charges pending. Thus, in completing the PSI, the probation officer used the personal information from Loyd's 2012 PSI. Loyd completed high school and some college. He was currently unemployed due to his incarceration, and his previous employment history was unknown.

While a juvenile, Loyd had adjudications for two robberies. As an adult, Loyd has been convicted of: attempted receiving stolen items (amended from receiving stolen items) (probation terminated unsatisfactorily); failure to appear (three times); obstructing an officer; "carrying a

concealed weapon possession - gun"; attempted burglary; and receiving stolen items (amended from burglary). He has also been fined for disorderly conduct, numerous traffic offenses, and possession of less than one ounce of marijuana. Subsequent to committing the current offense, Loyd was arrested for two counts of first degree murder and three counts of attempted first degree murder (all of which have additional counts of use of a firearm to commit a felony), and possession of a deadly weapon by a prohibited person; all of those charges were still pending at the time the PSI was completed.

The district court stated that it had reviewed the PSI, and specifically noted Loyd's "extensive" criminal history going back to 2006, which included an unsatisfactory termination of probation, a jail sentence, and a prison sentence. The district court also took note of Loyd's arrest on multiple counts of homicide, attempted homicides, and gun charges while awaiting trial in the current case. Additionally, the district court considered Loyd's disciplinary record while incarcerated, including restrictions and lockdowns for verbal abuse, lewd conduct, physical assault of an officer, and a flare of temper.

The district court considered Loyd's criminal history and was able to observe Loyd's personal qualities, including his demeanor and attitude. Additionally, Loyd provides no legal authority preventing a sentencing court from considering a defendant's arrest record, pending criminal charges, or disciplinary record while incarcerated. The Supreme Court has permitted sentencing courts to consider multiple arrests (*State v. Tucker*, 262 Neb. 940, 636 N.W.2d 853 (2001)), a withdrawn guilty plea on a previous charge (*State v. Klappal*, 218 Neb. 374, 355 N.W.2d 221 (1984)), and charges dismissed as part of a plea bargain (*State v. Janis*, 207 Neb. 491, 299 N.W.2d 447 (1980)). Finally, while it is true that Daniel received a shorter sentence than Loyd, Daniel pled guilty to a different crime and has different personal qualities than Loyd. These differences alone do not entitle Loyd to a lower sentence, particularly when examined in conjunction with the district court's other considerations.

At the time of Loyd's offense in March 2015, burglary was a Class III felony with a sentencing range of 1 to 20 years' imprisonment, a $25,000 fine, or both. See Neb. Rev. Stat. § 28-105 (Cum. Supp. 2014), and Neb. Rev. Stat. § 28-507 (Reissue 2008). (We note that Loyd's offense occurred prior to August 30, 2015, the effective date of 2015 Neb. Laws, L.B. 605, which changed the classification of certain crimes and made certain amendments to Nebraska's sentencing laws. For example, pursuant to L.B. 605, burglary became a Class IIA felony with a penalty of up to 20 years' imprisonment.) The district court sentenced Loyd to 14 to 18 years' imprisonment, with credit for 25 days served; this sentence was within the statutory guidelines and we find it was not excessive or an abuse of discretion.

## CONCLUSION

Loyd's conviction was supported by sufficient evidence and his sentence was not an abuse of discretion; his conviction and sentence are affirmed.

AFFIRMED.